654 A.2d 1344

IN RE OPINION NO. 26 OF THE COMMITTEE ON
THE UNAUTHORIZED PRACTICE OF LAW.

Argued January 5, 1993—Remanded June 4, 1993—Reargued
October 11, 1994—Decided March 13, 1995.

*Joseph M. Clayton, Jr.* argued the cause for appellant New Jersey Land Title Association (*Mr. Clayton,* attorney; *Mr. Clayton* and *John R. Weigel,* on the briefs).

*Arthur M. Greenbaum* argued the cause for appellant New Jersey Association of Realtors (*Greenbaum, Rowe, Smith, Ravin & Davis,* attorneys; *Mr. Greenbaum* and *Barry S. Goodman,* of counsel; *Mr. Greenbaum, Mr. Goodman, Jessica R. Mayer,* and *Luke J. Kealy,* on the briefs).

*Sarah T. Darrow,* Deputy Attorney General, argued the cause for respondent Committee on the Unauthorized Practice of Law (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*Michael A. Casale* and *John McGoldrick* argued the cause for *amicus curiae* New Jersey State Bar Association (*Colasanti, Ermel & Casale,* attorneys; *Mr. Casale,* on the briefs).

*Robert M. Washburn* submitted a brief on behalf of *amicus curiae* Builders League of South Jersey, Inc. (*Sherman, Silverstein, Kohl, Rose & Podolsky,* attorneys).

*Sydney V. Stoldt, Jr.,* submitted a brief on behalf of *amicus curiae* Bergen County Bar Association (*Stoldt & Horan,* attorneys; *Mr. Stoldt* and *Dorothy A. Kowal,* on the brief).

*Arthur J. Abramowitz* submitted a brief on behalf of *amicus curiae* Camden County Bar Association (*Mr. Abramowitz,* attorney; *Mr. Abramowitz* and *Edward D. Sheehan,* on the brief).

*Carol J. Truss* submitted a brief on behalf of *amici curiae* Monmouth County Bar Association and Middlesex County Bar Association (*Gross, Hanlon, Truss & Messer,* attorneys; *Ms. Truss, James E. Berube, Jr., Paul M. Griffin, Michael B. Steib, I. Mark Cohen, Leslie Vincent,* and *Alan M. Klatsky,* on the brief).

PER CURIAM.

We again confront another long-simmering dispute between realtors and attorneys concerning the unauthorized practice of law. *See New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtor Bds.,* 93 *N.J.* 470, 461 *A.*2d 1112 (1983). Title companies are also involved. Our resolution of the dispute turns on the identification of the public interest. Since our decision today permits sellers and buyers in real estate transactions involving the sale of a home to proceed without counsel, we find it necessary to state the Court's view of the matter at the outset. The Court strongly believes that both parties should retain counsel for their own protection and that the savings in lawyers fees are not worth the risks involved in proceeding without counsel. All that we

decide is that the public interest does not require that the parties be deprived of the right to choose to proceed without a lawyer.

■ The question before us is whether brokers and title company officers, who guide, control and handle all aspects of residential real estate transactions where neither seller nor buyer is represented by counsel, are engaged in the unauthorized practice of law. That many aspects of such transactions constitute the practice of law we have no doubt, including some of the activities of these brokers and title officers. Our power to prohibit those activities is clear. We have concluded, however, that the public interest does not require such a prohibition. Sellers and buyers, to the extent they are informed of the true interests of the broker and title officer, sometimes in conflict with their own interests, and of the risks of not having their own attorney, should be allowed to proceed without counsel. The South Jersey practice, for it is in that part of the state where sellers and buyers are most often unrepresented by counsel in residential real estate transactions, may continue subject to the conditions set forth in this opinion. By virtue of this decision, those participating in such transactions shall not be deemed guilty of the unauthorized practice of law so long as those conditions are met. Our decision in all respects applies not only to South Jersey, but to the entire state.

Under our Constitution, this Court's power over the practice of law is complete. *N.J. Const.* art. 6, § 2, ¶ 3. We are given the power to permit the practice of law and to prohibit its unauthorized practice. We have exercised that latter power in numerous cases. *In re Application of N.J. Soc'y of Certified Public Accountants,* 102 *N.J.* 231, 507 *A.*2d 711 (1986); *New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtor Bds.,* 93 *N.J.* 470, 461 *A.*2d 1112 (1983); *Cape May County Bar Ass'n v. Ludlam,* 45 *N.J.* 121, 211 *A.*2d 780 (1965); *New Jersey State Bar Ass'n v. Northern N.J. Mortgage Assocs.,* 22 *N.J.* 184, 123 *A.*2d 498 (1956); *In re Baker,* 8 *N.J.* 321, 85 *A.*2d 505 (1951); *Stack v. P.G. Garage,* 7 *N.J.* 118, 80 *A.*2d 545 (1951).

The question of what constitutes the unauthorized practice of law involves more than an academic analysis of the function of lawyers, more than a determination of what they are uniquely qualified to do. It also involves a determination of whether non-lawyers should be allowed, in the public interest, to engage in activities that may constitute the practice of law. As noted later, the conclusion in these cases that parties need not retain counsel to perform limited activities that constitute the practice of law and that others may perform them does not imply that the public interest is thereby advanced, but rather that the public interest does not require that those parties be deprived of their right to proceed without counsel. We reach that conclusion today given the unusual history and experience of the South Jersey practice as developed in the record before us.

We determine the ultimate touchstone—the public interest—through the balancing of the factors involved in the case, namely, the risks and benefits to the public of allowing or disallowing such activities. In other words, like all of our powers, this power over the practice of law must be exercised in the public interest; more specifically, it is not a power given to us in order to protect lawyers, but in order to protect the public, in this instance by preserving its right to proceed without counsel.

We believe that parties to the sale of a family home, both seller and buyer, would be better served if each were represented by counsel from the beginning to the end of the transaction, from contract signing through closing. We are persuaded, however, that they should continue to have the right to choose *not* to be represented. They should, of course, be informed of the risks. The record fails to demonstrate that the public interest has been disserved by the South Jersey practice over the many years it has been in existence. While the risks of non-representation are many and serious, the record contains little proof of actual damage to either buyer or seller. Moreover, the record does not contain proof that, in the aggregate, the damage that has occurred in South Jersey exceeds that experienced elsewhere. In this case,

the absence of proof is particularly impressive, for the dispute between the realtors and the bar is of long duration, with the parties and their counsel singularly able and highly motivated to supply such proof as may exist. The South Jersey practice also appears to save money. For the record demonstrates what is obvious, that sellers and buyers without counsel save counsel fees. We believe, given this record, that the parties must continue to have the right to decide whether those savings are worth the risks of not having lawyers to advise them in what is almost always the most important transaction they will ever undertake. We realize this conclusion means that throughout the transaction, sellers and buyers may not have the benefit of their own counsel but will look to brokers and title officers, often with conflicting interests, for practical guidance and advice.

# I

## *Proceedings Below*

Opinion No. 26 of the Committee on the Unauthorized Practice of Law, 130 *N.J.L.J.* 882 (March 16, 1992), was issued in response to an inquiry, one of many, from the New Jersey State Bar Association. The inquiry sought a determination of whether the South Jersey practice constituted the unauthorized practice of law. That practice, described in detail later, concerns the sale of a home generally financed by a purchase money mortgage. The essence of the South Jersey practice is that from the beginning of the transaction to the end, neither seller nor buyer is represented by counsel. Every aspect of the transaction is handled by others, every document drafted by others, including the contract of sale, affidavit of title, bond and mortgage. The Committee on the Unauthorized Practice of Law (the Committee), relying largely on our decisions in *New Jersey State Bar Association v. New Jersey Association of Realtor Boards*, 93 *N.J.* 470, 461 *A.*2d 1112 (1983); *Cape May County Bar Association v. Ludlam*, 45 *N.J.* 121, 211 *A.*2d 780 (1965); *New Jersey State Bar Association v. Northern New Jersey Mortgage Associates*, 32 *N.J.* 430, 161 *A.*2d 257 (1960),

and its own prior determination in Opinion No. 11 of the Committee on the Unauthorized Practice of Law, 95 *N.J.L.J.* 1345 (December 28, 1972), ruled that the ordering of a title search by the broker, the preparation of conveyancing and other documents by title officers, their clearing of title questions, and indeed the activities of both broker and title officers at the closing itself, where neither buyer nor seller was represented by counsel, that all of these activities constituted the unauthorized practice of law. The decision was interpreted widely as prohibiting the South Jersey practice, in effect prohibiting a seller and buyer from proceeding with the sale of a home without counsel.

On July 20, 1992, the Committee issued a notice to the bar and the public, clarifying its opinion. 131 *N.J.L.J.* 910 (July 20, 1992). The Committee explained that it did not intend to prohibit a seller or a buyer from proceeding in these matters without counsel. But at the same time the Committee adhered to its determination concerning what constituted the unauthorized practice of law in these matters, without in any way changing that determination. The result, it appeared to many, was that the right of seller and buyer to proceed without counsel was theoretical, for those whose help they would inevitably require to go through with the transaction seemed, by virtue of the Committee's opinion, to be able to give such help only by engaging in the unauthorized practice of law. Given the concerns of both potential sellers and buyers, as well as those of brokers and title officers, and given the fact that the South Jersey practice had continued for so long, we stayed the effect of Opinion No. 26 pending review by this Court.

Following briefing and oral argument by those interested in the matter—the organized bar, brokers, title officers—we remanded the matter to develop a fuller record, referring it to Judge Edward S. Miller, as Special Master, for that purpose. After sixteen days of hearing, Judge Miller rendered his report to us. While personally strongly favoring a requirement that sellers and buyers be represented by counsel, Judge Miller recommended

essentially that we allow the South Jersey practice to continue subject to certain conditions.

The hearing conducted by Judge Miller, leading to his findings and recommendations, is critical to our decision. It was directed not only at determining the extent of the practice of law engaged in by non-lawyers, a circumstance generally known and relatively uncomplicated, but more so at the consequences and implications of the practice. The purpose of the remand was to examine in depth the many factors that would enable this Court to determine whether and to what extent allowing parties to proceed without counsel in such transactions disserved the public interest. That remand was similar to the action taken by this Court in other unauthorized practice of law cases described later, although the depth and detail of both our inquiry and Judge Miller's hearing and report went beyond most such remands. We asked that the scope of the remand include not only all of the factual aspects of the South Jersey practice, but also its impact on buyers and sellers including both costs and risks; the knowledge of the parties of those risks, and of the conflicting interests of brokers and title officers; the frequency of transactions in which neither party is represented by counsel; comparable advantages and disadvantages to consumers in South Jersey transactions as compared to transactions where both are represented by counsel; the actual incidence of problems in both cases; remedies available to both buyers and sellers for damage caused by brokers or title officers; consumer satisfaction; and other matters. Judge Miller responded to all of our inquiries, and his recommendations covered the issues posed as well as some that arose during the hearings.

Judge Miller found that there had been no proof of actual damage resulting from the South Jersey practice, or more accurately that whatever problems existed did not in the aggregate exceed those in matters where the parties were represented by counsel, that many of the activities undertaken by brokers and title officers, taken in isolation, did not involve the practice of law

in any sense, and that, if informed of the risks, and of the interests of those who might otherwise be thought to represent them—including the conflicting interests of the brokers and title officers—sellers and buyers should have the right to decide whether or not to have counsel.

Judge Miller found that when both buyer and seller are represented by counsel, the fees in South Jersey are lower than those in North Jersey. Although he made no explicit finding on the point, implicit in all of his findings is the obvious fact that the unrepresented buyers and sellers in the South Jersey practice save the entire counsel fee they would otherwise have to pay, a fairly substantial sum. He was strongly of the opinion that those savings were not worth the risk that inevitably existed where either seller or buyer went unrepresented. Given this Court's prior decisions on related matters, however, he concluded that the judiciary could not, or would not, mandate representation, but rather that all of the foregoing circumstances called for a determination allowing the continuation of the South Jersey practice subject to various conditions. He recommended that the Court allow brokers to order title reports, contrary to the opinion of the Committee; that only attorneys be allowed to draft the bargain and sale deed, but where that drafting was not accompanied by true representation and advice of counsel, it could be done by others only through the explicit request in writing of the seller; that any other similar conveyancing documents, presumably the bond and mortgage, could be drafted by lawyers representing the title company, again only at the specific written request of either the buyer or mortgagee;[1] that neither the broker nor the title officers present at the closing, or at any other time, could render legal advice; that while the title company could attempt to resolve certain kinds of problems affecting the title, such as arranging to pay off prior mortgages and judgment liens, it could not attempt

---

[1] Although the record shows that mortgage documents are usually prepared by the lender, the lender may, in accordance with Judge Miller's recommendation, request in writing that the title company prepare these documents.

to resolve others, or presumably give any advice concerning others, such as restrictions on use, easements, and rights of way. Finally, he recommended that the practice, especially the South Jersey practice, of title companies conducting settlements where both buyer and seller are unrepresented be allowed, thereby disagreeing with the Committee's conclusion that such conduct constituted the unauthorized practice of law. He agreed with the Committee's condemnation of conduct that encourages the parties not to retain counsel.

Judge Miller so ruled even though it was his opinion that practically every aspect of a real estate transaction involving the sale of a home constituted the practice of law. As he put it, if he thought he had the power, he would require that both seller and buyer be represented by counsel.

While technically the matter now before us is the review of the opinion of the Committee, *R.* 1:22–7(b) and *R.* 1:19–8, we now have the benefit of a full hearing, along with the findings of fact and recommendations that are part of the Special Master's report. The subsequent oral argument and briefing by the parties who participated in that hearing, the New Jersey State Bar Association, the New Jersey Association of Realtors and the New Jersey Land Title Association, focused on both Opinion No. 26 and Judge Miller's report. Our decision today, substantially in accord with Judge Miller's recommendations, affirms portions of Opinion No. 26 and reverses others. Specifically, we rule as follows: a real estate broker may order a title search and abstract; an attorney retained by a title company or a real estate broker may not prepare conveyance documents for a real estate transaction except at the specific written request of the party on whose behalf the document is to be prepared; a title company may not participate in the clearing of certain legal objections to title, see *infra* at 359, 654 *A.2d* at 1362; and the practice of conducting closings or settlements without the presence of attorneys shall not constitute the unauthorized practice of law. We hold further, however, that

unless the broker conforms to the conditions set forth later in this opinion, all participants at the closing who have reason to believe those conditions have not been complied with will be engaged in the unauthorized practice of law, and any attorney with similar knowledge so participating in such a transaction will have committed unethical conduct.

## II

### *The South Jersey Practice*

Although the variations are numerous, the South Jersey practice complained of typically involves residential real estate closings in which neither buyer nor seller is represented by counsel, and contrasts most sharply with the North Jersey practice if one assumes both parties are represented there. Obviously, that is not always the case: the record shows that about sixty percent of the buyers and about sixty-five percent of the sellers in South Jersey are not represented by counsel. In North Jersey, only one half of one percent of buyers, and fourteen percent of sellers, proceed without counsel.

In North Jersey, when both seller and buyer are represented by counsel, they sign nothing, agree to nothing, expend nothing, without the advice of competent counsel. If, initially without counsel, they sign a contract of sale prepared by the broker, they ordinarily then retain counsel who can revoke that contract in accordance with the three-day attorney review clause. They are protected, and they pay for that protection. The seller in North Jersey spends on average $750 in attorney fees, and the buyer in North Jersey spends on average $1,000. The buyer in South Jersey who chooses to proceed without representation spends nothing. The South Jersey seller whose attorney does no more than prepare the deed and affidavit of title, usually without even consulting with the seller, spends about $90. South Jersey buyers and sellers who are represented throughout the process, including

closing, pay an average of $650 and $350, respectively.[2]  Savings obviously do not determine the outcome of this case; they are but one factor in the mix of competing considerations.

The typical South Jersey transaction starts with the seller engaging a broker who is ordinarily a member of the multiple listing system.  The first broker to find an apparently willing buyer gets in touch with the seller and ultimately negotiates a sale price agreeable to both.  The potential buyer requires financing arrangements which are often made by the broker.  Before the execution of any sales contract the broker puts the buyer in touch with a mortgage company to determine if the buyer qualifies for the needed loan.

At this preliminary stage, no legal obligations of any kind are likely to have been created, except for those that arise from the brokerage relationship itself.

Assuming the preliminary understanding between the seller and buyer remains in effect, the broker will present the seller with the standard form of contract used in that area (usually a New Jersey Association of Realtors Standard Form of Real Estate Contract). That form includes, pursuant to our opinion in *New Jersey State Bar Association v. New Jersey Association of Realtor Boards,* 93 *N.J.* 470, 461 *A.*2d 1112 (1983), notice that the attorney for either party can cancel the contract within three business days.  If the seller signs the contract, and does not within three days retain counsel, the seller will have become legally bound to perform numerous obligations without the benefit of any legal advice whatsoever, some of which may turn out to be onerous, some costly, some requiring unanticipated expense, and some beyond the power of the seller to perform, with the potential of substantial liability for such nonperformance.  Many sellers will not under-

---

[2] It is suggested that although the parties under the South Jersey practice save the cost of counsel, the savings may be offset to some extent because they nonetheless pay others for services attorneys in North Jersey customarily provide.

stand just what those obligations are, and just what the risks are. Not only has the seller not retained a lawyer, the only person qualified to explain those risks. Worse yet, the only one the seller has had any contact with in the matter is the broker, whose commission depends entirely on consummation of the transaction, and whose interest is primarily—in some cases it is fair to say exclusively—to get the contract signed and the deal closed.

After the seller signs the contract, the broker delivers it to the buyer for execution. The buyer may not know if the description of the property is precisely that assumed to be the subject of the purchase. The buyer may have no idea if the title described in the contract is that with which he would be satisfied, no sound understanding of what the numerous obligations on the part of the seller mean, and no fair comprehension of whether all of the possible and practical concerns of a buyer have been addressed by the contract. No lawyer is present to advise or inform the buyer; indeed, there is no one who has the buyer's interest at heart, only the broker, whose interests are generally in conflict with the buyer's. Although the record does not dispose of the issue, and although Judge Miller explicitly left it undecided, he noted concern that the broker, through his or her actions, may lead the buyer to believe that the broker is looking out for the buyer's interests. Therefore, without independent advice, the buyer signs the contract. If no attorney is retained within three days, the buyer is bound by all of its terms.

For both seller and buyer, it is that contract that substantially determines all of their rights and duties. Neither one of them can be regarded as adequately informed of the import of what they signed or indeed of its importance. At that point the broker, who represents only the seller and clearly has an interest in conflict with that of the buyer (the broker's interest is in consummation of the sale, the buyer's in making certain that the sale does not close unless the buyer is fully protected) performs a series of acts on behalf of the *buyer*, and is the only person available as a practical matter to explain their significance to the buyer. The broker

orders a binder for title insurance, or a title commitment to make sure that the *buyer* is going to get good title. The buyer has no idea, and hopefully never will have, whether the broker ordered the right kind of title search, a fairly esoteric question that only an experienced attorney can determine.

The broker also orders numerous inspection and other reports, all primarily of interest to the buyer, to make certain that not only is the title good, but that there are no other problems affecting the premises, the house and their use. Those reports can have substantial legal consequences for both seller and buyer. For example, at what threshold dollar amount of required repairs should the seller (or the buyer) be able to cancel the contract? At what dollar amount should the buyer ignore the repairs? At what dollar amount should the buyer be able to compel the seller to make the repairs, and within what time frame? At this stage of the transaction the help of a lawyer could be invaluable, and the advice of a broker problematic.

The seller in the meantime is happy to hear from no one, for it suggests there are no problems. Eventually, the seller is told that a deed will be arriving drafted by an attorney selected by the broker, the instrument that our decisions clearly require may be drafted only by the seller's attorney. *Cape May County Bar Ass'n v. Ludlam*, 45 *N.J.* 121, 211 *A.*2d 780 (1965). Of course, the purpose of that ruling was to assure competent counsel in the drafting of such a uniquely legal document, but "competent" always meant counsel who understood the entire transaction. In South Jersey, the attorney selected by the broker, while theoretically representing the seller, may be primarily interested in the broker, the source of the attorney's "client" and the likely source of future "clients," and consequently primarily interested in completing the sale. That attorney is likely to prepare a deed satisfactory to the title company—in fact that attorney often does not even contact the seller. He or she may have no idea of anything in the contract of sale other than the description of the land and the fact that a certain kind of deed is required. No

advice on the substance of the transaction comes from such an attorney even though the seller may get the impression that, since an attorney drafted the deed, the seller's interests are somehow being protected. In fact, the only protection those interests ever received, other than those that happened to appear in the form contract, is in the numbers inserted in that contract, the total purchase price, the down payment, and the closing date, for those are probably the only terms of that contract fully understood by the seller.

The buyer's position is even worse when the closing occurs. The seller will at least know that he or she got paid. Legal training is not required for that fact, even though there is no practical assurance that the seller will not thereafter be sued. The buyer, on the other hand, wants something that is largely incomprehensible to almost all buyers, good and marketable title, one that will not result in problems in the future. What the buyer gets before closing is a "title binder," a piece of paper that may suggest something about the quality of the seller's title, but that is very much in need of explanation for any substantial understanding of its meaning. The title company is required to mail to the unrepresented buyer notice of any exceptions or conditions associated with the title insurance policy. *N.J.S.A.* 17:46B–9. This notice, which must be sent five days prior to the closing, must also notify the buyer of the right to review the title commitment with an attorney. *Ibid.* If the buyer chooses not to retain an attorney, there is no one to give the buyer that understanding other than the broker and the title agent. The broker's knowledge will often be inadequate, and the conflicting interest apparent. The title company similarly has a conflicting interest, for it too is interested in completion of the transaction, the *sine qua non* of its title premium. But the title company is also interested in good title, for it is guaranteeing that to the mortgage company, as well as to the buyer. "Good title," however, may be one on which the title company and the mortgagee are willing to take a risk, but one on which a buyer might or should not be willing to, if the buyer knew what the risk was. Again, there is no one to tell the buyer what

those risks are, and in some cases the explicit exceptions found in a title policy, those matters that the title company will not guarantee, are of the greatest importance. The significance of those matters is conceded by all to be something that only attorneys can give advice on, and it is contended by all that they never give such advice. Yet such exceptions exist, and title still closes, and the buyer is totally unrepresented by counsel. One must assume that somewhere, somehow, the buyer is satisfied that there is nothing to worry about, leading to the inescapable conclusion that either the broker or the title officer provides some modicum of assurance or explanation.

The day for closing arrives and everyone meets, usually at the offices of the title company. Seller and buyer are there, each without an attorney; the broker is there, and the title officer is there, representing both the title company and the mortgagee. The funds are there. And the critical legal documents are also on hand: the mortgage and the note, usually prepared by the mortgagee; the deed, along with the affidavit of title, prepared by the attorney selected by the broker or by the title company; the settlement statement, usually prepared by the title company, indicating how much is owed, what deductions should be made for taxes and other costs and what credits are due; and the final marked-up title binder, which evidences the obligation of the title company to issue a title policy to the buyer, and which at that point is probably practically meaningless to the buyer. All are executed and delivered, along with other documents, and the funds are delivered or held in escrow until the title company arranges to pay off prior mortgages and liens.

It would take a volume to describe each and every risk to which the seller and buyer have exposed themselves without adequate knowledge. But it takes a very short sentence to describe what apparently occurs: the deal closes, satisfactory to buyer and seller in practically all cases, satisfactory both at the closing and thereafter.

## III

### *The Unauthorized Practice of Law*

■ As noted above, this transaction in its entirety, the sale of real estate, especially real estate with a home on it, is one that cannot be handled competently except by those trained in the law. The most important parts of it, without which it could not be accomplished, are quintessentially the practice of law. The contract of sale, the obligations of the contract, the ordering of a title search, the analysis of the search, the significance of the title search, the quality of title, the risks that surround both the contract and the title, the extent of those risks, the probability of damage, the obligation to close or not to close, the closing itself, the settlement, the documents there exchanged, each and every one of these, to be properly understood must be explained by an attorney. And the documents themselves to be properly drafted, must be drafted by an attorney. Mixed in with these activities are many others that clearly do not require an attorney's knowledge, such as the ordering of inspection and other reports, and the price negotiation. But after that, even though arguably much can be accomplished by others, practically all else, to be done with full understanding, requires the advice of counsel.

As this Court's prior treatment of the subject shows, the prohibition against non-lawyers engaging in activities that are the practice of law is not automatic.[3] Having answered the question

---

[3] Our use of the word "non-lawyers" or "laypersons" here and elsewhere is not intended to cover all cases of unauthorized or impermissible practice of law. Title officers are often lawyers, but since they do not represent the buyer, their performance of legal functions for the buyer have no more legitimacy than the actions of laypersons. *Cf. Stack v. P.G. Garage,* 7 *N.J.* 118, 80 *A.*2d 545 (1951) (layperson cannot be retained to practice law even though legal work done by lawyer).

We note that some of the cases in this area conclude that the practice of law, although performed by lawyers, is nevertheless unauthorized where the attorneys are employed by the title company, a corporation, the conclusion seemingly based on the observation that corporations may not practice law. *See New Jersey State Bar Ass'n v. Northern New Jersey Mortgage Assocs.,* 32 *N.J.* 430, 437, 161

whether the practice of law is involved, we must decide whether the public interest is served by such prohibition. Not every such intrusion by laypersons into legal matters disserves the public: this Court does not wear public interest blinders when passing on unauthorized practice of law questions. We have often found, despite the clear involvement of the practice of law, that non-lawyers may participate in these activities, basing our decisions on the public interest in those cases in allowing parties to proceed without counsel.

Practically all of the cases in this area are relatively recent. They consistently reflect the conclusion that the determination of whether someone should be permitted to engage in conduct that is arguably the practice of law is governed not by attempting to apply some definition of what constitutes that practice, but rather by asking whether the public interest is disserved by permitting such conduct. The resolution of the question is determined by practical, not theoretical, considerations; the public interest is weighed by analyzing the competing policies and interests that may be involved in the case; the conduct, if permitted, is often conditioned by requirements designed to assure that the public interest is indeed not disserved.

In *Auerbacher v. Wood*, 142 *N.J.Eq.* 484, 59 *A.*2d 863 (E. & A. 1948), our then highest court held that someone who performs the usual functions of a labor relations consultant is not guilty of the

---

A.2d 257 (1960). Rather clearly, however, the basic evil is that the person performing the legal service is in no sense doing it for the *party*, but rather in the interest of the employer, the title company, neither of them (the lawyer or the title company) representing the party, be it seller, buyer or lender. Even if the title organization entity consisted of but one individual, not a corporation, but one attorney, even one who actually did all of the legal work, that practice of law would be unauthorized, impermissible, for it is only an attorney retained by and actually representing the client who is authorized to practice law on the client's behalf. What is involved is not simply the license to practice, but the professional duty of loyalty that is included in the concept of permissible representation. Depending on the circumstances, attorneys who act purportedly on behalf of those they do not represent may be engaged in the unauthorized practice of law, or unethical professional conduct, or both.

unauthorized practice of law. The court noted that the issue could not be determined by reference to any satisfactory definition. "What constitutes the practice of law does not lend itself to precise and all inclusive definition. There is no definitive formula which automatically classifies every case." *Id.* at 485, 59 *A.*2d 863. The court noted that in drawing the line between that which is and is not permitted, "guidance is to be found in the consideration that the licensing of law practitioners is not designed to give rise to a professional monopoly, but rather to serve the public right to protection against unlearned and unskilled advice and service in matters relating to the science of the law." *Id.* at 486, 59 *A.*2d 863. In *In re Baker,* 8 *N.J.* 321, 334, 85 *A.*2d 505 (1951), this Court, holding respondents in contempt for their unauthorized practice of law, similarly observed that "[t]he reason for prohibiting the unauthorized practice of the law by laymen is not to aid the legal profession but to safeguard the public from the disastrous results that are bound to flow from the activities of untrained and incompetent individuals," those not only lacking the many years of preparation, but also the high standards of professional conduct imposed on members of the bar and enforced by the Court.

In a case involving some of the same questions now before us, *New Jersey State Bar Association v. Northern New Jersey Mortgage Associates,* 22 *N.J.* 184, 123 *A.*2d 498 (1956), an appeal was taken from the trial court's dismissal of a suit alleging unauthorized practice of law, the trial court concluding that the Supreme Court had exclusive jurisdiction over such matters. The action had been brought by the New Jersey State Bar Association and five individual attorneys. The practice complained of was quite similar to that found in South Jersey, although in fact the business was conducted in North Jersey. The defendants, in the business of searching titles, acting as agents for title companies, and handling the closing of transactions involving sellers, buyers, and mortgagees, admitted that they prepared bonds, mortgages and other instruments connected with titles and mortgage loans, and that the services performed incidental to closing included the

giving of legal advice in connection with those transactions. *Id.* at 190–92, 123 *A.*2d 498.

We ruled that our exclusive power over the practice of law did not divest a court of chancery (the trial court) of its jurisdiction to enjoin the unauthorized practice of law. *Id.* at 193, 123 *A.*2d 498. We further ruled that the individual plaintiffs could maintain the action only if they could show irreparable damage to their own individual financial interests, and since they could not, the dismissal of the action as to them was affirmed. *Id.* at 196, 199, 123 *A.*2d 498. The Bar Association, however, was placed on a different footing, for in its attempts to enjoin the unauthorized practice of law it sought to protect the public interest, for the protection of which an injunction could be granted. *Id.* at 194, 196, 123 *A.*2d 498. In that respect the action was deemed to be "on behalf of the public." *Id.* at 194, 123 *A.*2d 498.

In analyzing the Bar Association's claim to represent the public interest, we noted that, concerning the nature of the right to practice law, the more recent attitude in New Jersey has been "that admission to our bar is a privilege granted in the interest of the public to those who are morally fit and mentally qualified, solely for the purpose of protecting the unwary and the ignorant from injury at the hands of persons unskilled or unlearned in the law" and that "[a]ttorneys enjoy rights peculiar to themselves, not enjoyed by those outside the profession, but only as an incident to the public welfare." *Id.* at 195, 123 *A.*2d 498. We further noted that the licensing of attorneys " 'is not designed to give rise to a professional monopoly, but rather to serve the public right to protection against unlearned and unskilled advice and service in matters relating to the science of the law.' " *Ibid.* (quoting *Auerbacher v. Wood, supra,* 142 *N.J.Eq.* at 486, 59 *A.*2d 863).

The case was remanded to the Chancery Division to develop a more complete record, similar to the remand in this case to the Special Master. The host of issues set forth by the Court on which further evidence was required before a determination could be made are similar to those in this matter on which we sought

further information, at least in the sense that they asked more than questions obviously directed at specific conduct that might constitute the practice of law: the questions sought to know more about the business that was going on, the relationships between the parties, the possibility that independent counsel was being discouraged, the charges made, the exact fee and compensation arrangements, and the percentage of occasions when parties were represented by counsel, *id.* at 199, 123 *A.*2d 498, all obviously for the purpose of enabling the Court to make a sound decision based on the public interest rather than one premised on some abstract definition of the practice of law.

After remand and plenary hearing, this Court again certified the appeal, on its own motion, from the trial court's dismissal of the charge that defendants were engaged in the unauthorized practice of law. *New Jersey State Bar Ass'n v. Northern N.J. Mortgage Assocs.*, 32 *N.J.* 430, 161 *A.*2d 257 (1960). In passing on the issues the Court repeated again that the restrictions against the practice of law by non-lawyers "are designed to serve the public interest by protecting 'the unwary and the ignorant from injury at the hands of persons unskilled or unlearned in the law.'" *Id.* at 436, 161 *A.*2d 257 (citation omitted). Noting that "the line between such activities and permissible business and professional activities by non-lawyers is indistinct," *id.* at 437, 161 *A.*2d 257, and that some fields may in some areas properly overlap the law, we went on to observe that "each individual set of circumstances must be passed upon 'in a common-sense way which will protect primarily the interest of the public and not hamper or burden that interest with impractical and technical restrictions which have no reasonable justification.'" *Ibid.* (quoting *Gardner v. Conway*, 234 *Minn.* 468, 48 *N.W.*2d 788, 797 (1951)).

The message is clear: not only is the public interest the criterion for determining what is the unauthorized practice of law, but in making that determination practical considerations and common sense will prevail, not impractical and technical restrictions that may hamper or burden the public interest with no

reasonable justification. That language is from a court that previously had remanded the case to get the full record that would give it all of the facts that would enable it to determine that public interest. The title company, the company that had succeeded to the interests of defendants in the prior case, claimed that on the basis of the entire record its activities did not constitute the unauthorized practice of the law. By then the measuring rod was clear, for the title company's contention was that "the public policy of this State" compelled that conclusion. *Id.* at 447, 161 *A.*2d 257. The Court disagreed, but not with the standard against which the issue would be determined, for it found that by enjoining the practices involved in the case "the public interest will not be disserved but on the contrary will be significantly advanced." *Ibid.* There, the public interest consisted of removing "unwarranted charges imposed by the Title Company on purchasers" and encouraging "parties to obtain the important protection of independent counsel." *Ibid.*

In *State v. Bander,* 56 *N.J.* 196, 265 *A.*2d 671 (1970), we sounded the same theme, although in a different context. There we held that the disorderly persons act definition of the unauthorized practice of law did not cover a broker who had prepared a contract for the sale of land even though that conduct, as implied by the decision, clearly constituted the practice of law. We concluded that even if it was the unauthorized practice of law, the broker not being an attorney, the Legislature was free to exclude it (as it did) from its criminal sanctions without offending this Court's exclusive power to determine what constitutes the unauthorized practice of law: in other words, while we may have that exclusive power, it does not prevent the Legislature from criminalizing only certain conduct that constitutes the unauthorized practice of law, leaving others unaffected by the criminal law, although still vulnerable to such prohibitions and remedies as this Court may devise outside of the criminal law. As a result of that conclusion, we noted that we did not have to reach the question "whether defendant's actions constituted an unauthorized practice of law." *Id.* at 202, 265 *A.*2d 671. The significance of the case, insofar as the present issue is

concerned, was in our subsequent discussion of that issue, which "was partially explored at the oral argument" of the case. *Ibid.*

It developed that the problem has so many ramifications that it could not be intelligently considered on the present record. As to that issue it is suggested that an answer might be obtained in a separate suit for an injunction against the type of acts undertaken by defendant or for a declaratory judgment. In this manner a complete and detailed record could be made disclosing, *inter alia,* the extent, length of existence, effect and result of the performance of similar acts by real estate brokers generally *and the public need for such service.* This Court could then give a valued and intelligent reply to such an inquiry.

[*Id.* at 202–203, 265 *A.*2d 671 (emphasis added).]

That opinion, commenting on an activity that clearly involved the practice of law—the drafting of a contract for the sale of land by a non-lawyer—suggested our approach to the public interest standard that governed determinations of what constituted the unauthorized practice of law. It was an interest to be determined not by any abstract definition, but by a "complete and detailed record," including "the extent, length of existence, effect and result of the performance of similar acts by real estate brokers," and ultimately a record that would show "the public need for such service." That is, of course, precisely the record developed thereafter in order to determine that specific issue, the public interest in the right of parties to decline legal representation in the drafting of real estate sales contracts. *New Jersey Ass'n of Realtor Bds., supra.*

Although the public interest standard for determination of the issue of unauthorized practice of law remained intact, Opinion No. 11 of the Committee on the Unauthorized Practice of Law, 95 *N.J.L.J.* 1345 (Dec. 28, 1972), reached a conclusion on it different from what we have determined in this case. The issue there was practically identical to that now before us. What was involved was the South Jersey practice. The Committee decided, contrary to our decision today, and based largely on the decision in *Northern New Jersey Mortgage Associates, supra,* 32 *N.J.* at 430, 161 *A.*2d 257, that title companies are engaged in the unauthorized practice of law when they issue a title search or policy or abstract at the request of a broker and that they are similarly guilty when they

conduct real estate settlements on their premises without the presence of an attorney for any of the parties to the transaction. While the facts in the case were somewhat different from those here (the Committee finding that the parties to the transaction were discouraged by brokers from retaining counsel, that this practice was encouraged when title companies paid rebates to referring brokers for their business, and that apparently practically all documents were drafted by the title company) their similarity is remarkable. Indeed, if that opinion were to be followed, we would be obliged to declare the acts challenged before us the unauthorized practice of law. The critical difference, of course, is that there was no showing in that case before the Committee similar to that found in the record before us of the impact on the public interest in allowing the South Jersey practice to continue. Apparently, all that the Committee had before it was an unadorned description of what occurs prior to and during the closing, without any evaluation of its benefits and detriments, without any evaluation of the advantages and disadvantages to the public. For present purposes, however, Opinion No. 11 is of note in its firm adherence to the standards set by the prior cases. In determining the issue the Committee said, "the measuring rod is the public interest," 95 *N.J.L.J.* at 1345, and asked, "Does this practice serve the public interest?" *Id.* at 1360. Its conclusion was that it did not. In support of its ultimate conclusion prohibiting settlements without the presence of attorneys, the Committee said, "Since the practice does constitute the practice of law *and* such practice by a lay corporation or person is not in the public interest, it constitutes the unauthorized practice of law." *Ibid.* (emphasis added). It is of course remarkable that despite Opinion No. 11 the South Jersey practice flourished, leading ultimately to Opinion No. 26, the matter before us today.

The public interest standard in determining what constitutes the unauthorized practice of law was again applied in *In re Education Law Center,* 86 *N.J.* 124, 429 *A.*2d 1051 (1981). Despite the clear prohibition against the practice of law by corporations, long a part of our jurisprudence and then codified by *Rule* 1:21–1(c), we held

that a public interest law firm, a non-profit corporation, would not be engaged in the unauthorized practice of law if it adhered to certain conditions specified in our opinion. We recognized that there was an absolute prohibition against the practice of law by corporations, and that the reasons for that prohibition—the potential conflict of interest between loyalty to the client and loyalty to the corporation—could exist as strongly when that practice was engaged in by non-profit corporations that charged no fee as it could with for-profit corporations receiving a fee. *Id.* at 136, 429 *A.*2d 1051. In the case of the non-profit public interest law firm, the conflicting loyalty might be to the social, political, or legislative goals of the firm; with the ordinary corporation, its business, along with the profit motive, provides the obvious conflict. Noting that the Education Law Center was unquestionably engaged in the practice of law through its attorney employees, we nevertheless held that its practice was not unauthorized. Quoting from *Auerbacher, supra,* we reiterated the principle that our power to regulate the practice of law was not designed to create a monopoly for lawyers but rather to serve the public. *Id.* at 133, 429 *A.*2d 1051. Noting the important contributions that public interest law firms such as the Education Law Center have made and will continue to make, we decided that "[c]onsiderations of public policy thus lead us to conclude that if other considerations impel such entities to organize as non-profit corporations, it may be possible for such corporations to practice law, provided certain rigorous standards are met, notwithstanding the general prohibition of *R.* 1:21–1(c)." *Id.* at 137, 429 *A.*2d 1051.

The case is important not only for the recognition that "competing policy considerations call for an exemption of non-profit corporations operating for charitable and benevolent purposes" from the otherwise applicable "policies on which the general prohibition of the practice of law by corporations is based," *id.* at 140, 429 *A.*2d 1051, but also for the approach to the resolution of the problem taken by the Court. Noting that the petitioner in that case, the Education Law Center, had scrupulously avoided any possibility of conflict on the part of its attorney employees that

might dilute in the least their total loyalty to their clients (including a strict policy of noninterference in any way with the handling of the case once assigned to the attorney, and the selection of cases to be represented through a committee of the corporation that consisted solely of lawyers), we conditioned our ruling by imposing similar requirements on other public interest law firms. *Id.* at 139–40, 429 *A*.2d 1051. Only if those conditions were met would the practice of law, otherwise unauthorized, be permissible. That is the approach we take in this case, the imposition of conditions to assure the public interest is not disserved, as well as that taken in the important cases involving the preparation of real estate contracts by brokers, *New Jersey Association of Realtor Boards, supra,* and inheritance tax returns by accountants, *In re Application of New Jersey Society of Certified Public Accountants,* 102 *N.J.* 231, 507 *A*.2d 711 (1986).

In what is undoubtedly the clearest example of the dominating influence of the public interest in this area, we decided in *New Jersey Association of Realtor Boards, supra,* that real estate brokers may draft contracts for the sale of residential property if the contract contains a prominent clause informing the parties of their right, through counsel, to cancel it within three days. While our decision took the form of the approval of a settlement reached between the brokers and the bar, our approval was explicitly based on a finding by Justice Sullivan, sitting as the trial judge, that the settlement was in the public interest, a finding with which we concurred. The initially proposed settlement of the matter had previously been submitted to us and subjected to a public hearing, but after being informed that the settlement had unraveled, we remanded the matter for trial to Justice Sullivan. At that trial a new settlement was arrived at and again subjected to a public hearing before the trial court.

Noting the position of those who objected to the settlement in its entirety, Justice Sullivan concisely summed up the entire law in this area with the observation that "[t]he basic question is how is the public interest best served." *New Jersey State Bar Ass'n v.*

*New Jersey Ass'n of Realtor Bds.,* 186 *N.J.Super.* 391, 396, 452 A.2d 1323 (Ch.Div.1982). He concluded that "the settlement is in the public interest" and that the three-day cancellation clause "affords adequate protection to purchasers and sellers of residential real estate or lessors and lessees thereof." *Id.* at 398, 452 A.2d 1323. In so concluding, he noted that it had been asserted "without contradiction that '[n]o State in the Country has prohibited Brokers from completing form contracts in connection with residential property sales.'" *Id.* at 396, 452 A.2d 1323. The record in this case also demonstrates that the conduct in question is permitted in many other states.

Again, conduct that would clearly constitute the unauthorized practice of law was permitted based on the public interest, and again permitted only if it conformed to conditions that assured the public interest would indeed not be disserved. In affirming Justice Sullivan's approval we noted that the record supported his conclusion that the settlement would "protect the public interest." *New Jersey Ass'n of Realtor Bds., supra,* 93 *N.J.* at 473, 461 A.2d 1112. And anticipating the possibility of further needed amendments to assure that the public interest was served, we referred to the "further possible modification of the present accord pursuant to the exercise of the Court's constitutional rule-making authority over the practice of law." *Id.* at 474, 461 A.2d 1112. The significance of the resolution of the case lies not only in the reaffirmation of the public interest standard, and its achievement through the imposition of conditions, but in the enormous practical importance of the decision in terms of the interest groups involved, the initial adversarial contest that so clearly exposed the issues, and ultimately the compelling strength of the public interest standard not simply in abstract terms, but in view of the very large number of citizens affected. We were dealing there with the public of the state of New Jersey, not with some esoteric practice affecting a limited number of people, but with a practice affecting all of us. To a significant extent, the matter before us today is similarly compelling.

Our most recent decision is *In re Application of New Jersey Society of Certified Public Accountants, supra,* 102 *N.J.* 231, 507 *A.*2d 711, in which we held, contrary to the long-standing Opinion No. 10 of the Committee on the Unauthorized Practice of Law, 95 *N.J.L.J.* 1209 (Nov. 16, 1972), that certified public accountants could prepare and file New Jersey inheritance tax returns subject to certain conditions. While recognizing that the preparation and filing of such a return involved legal principles requiring the exercise of our supervisory authority over the practice of law, and that recent changes in the law would require "more detailed and complex returns" than before, we concluded that "the interests of the public will not be compromised if Opinion No. 10 is modified to allow a limited exception that permits certified public accountants licensed in New Jersey to prepare and file Inheritance Tax Returns." *In re Application of New Jersey Society of Certified Public Accountants, supra,* 102 *N.J.* at 233, 507 *A.*2d 711.

That case, as with the brokers and the bar, was a culmination of a long struggle between accountants and attorneys that went back at least to 1955 when the Attorney General issued Formal Opinion No. 19 prohibiting anyone but attorneys from preparing and filing such a return. Formal Opinion—1955 No. 19, 1954–55 *Op.Att'y Gen.N.J.* 146 (1955). As in this case, and in the case involving the brokers and the bar, when the matter was first brought before us, and after oral argument, we remanded the matter to the Committee to make recommended findings of fact and conclusions of law. We wanted to know all of the implications of the prohibition and its impact on the public before rendering judgment. It was not enough simply to observe that the practice of law was involved. The Committee, after inviting written comments and conducting a hearing, adhered to its prior opinion prohibiting *all* accountants from preparing and filing inheritance tax returns.

In our decision, differing with the Committee, we observed that "the line between permissible business and professional activities and the unauthorized practice of law is often blurred," *In re Application of New Jersey Society of Certified Public Accoun-*

*tants, supra,* 102 *N.J.* at 236, 507 *A.*2d 711, that the purpose of our power is " 'to serve the public's right to protection against unlearned and unskilled advice in matters relating to the science of the law,' " *id.* at 237, 507 *A.*2d 711 (citation omitted), and that in these cases "we must try to avoid arbitrary classifications and focus instead on the public's realistic need for protection and regulation." *Ibid.* Put in ordinary language, we again quoted the Supreme Court of Minnesota, to the effect that "each set of circumstances must be considered 'in a common-sense way which will protect primarily the interest of the public and not hamper or burden that interest with impractical and technical restrictions which have no reasonable justification.' " *Ibid.* (quoting *Gardner v. Conway,* 234 *Minn.* 468, 48 *N.W.*2d 788, 797 (1951)). As with contracts for the sale of land, in which we limited the exemption permitting the practice of law to real estate brokers so that not anyone could draw such a contract, in the accountants' case the exemption was limited to certified public accountants, again so that not anyone, and not even an ordinary accountant, could prepare and file inheritance tax returns.

Recognizing that while some estates are clearly simple enough to allow accountants to prepare the return, we noted that others are so complex as clearly to require the use of attorneys, and that some fell in between these two extremes. We concluded that while our supervisory power over the practice of law must be exercised in this field, "we will not impose needlessly restrictive conditions that disserve the public interest." *Id.* at 241, 507 *A.*2d 711. Noting the training and the examination requirements imposed on certified public accountants, as well as the disciplinary power that the board regulating them possesses, we concluded that many were qualified both by training and experience to prepare these returns for most estates. We also noted the certified public accountants' assertion "that the federal government allows qualified certified public accountants to practice before the Treasury Department and the United States Tax Court, 26 *C.F.R.* § 601.502 (1984), and that a majority of states permits certified public accountants to prepare, sign, and receive a fee for preparing inheritance tax returns." *Id.* at 239, 507 *A.*2d 711. All of those facts compelled "the conclusion that the public interest

would best be served by permitting certified public accountants to prepare and file Inheritance Tax Returns without the supervision of an attorney," subject to certain conditions. *Id.* at 241–42, 507 *A.*2d 711. We decided, in other words, that it was the public interest that determined the outcome, but that in serving that public interest it was necessary to impose conditions that assured that it would be served.

One of the conditions was that "the client be notified in writing, before the certified public accountant commences work on the return, that review of the return by a qualified attorney may be desirable because of the possible application of legal principles to the preparation of the tax return." *Id.* at 242, 507 *A.*2d 711. And that was not all: we warned accountants that their failure to consult counsel or advise a client of the need to obtain counsel might constitute a deviation from the accountant's standard of care and result in civil liability. *Ibid.* Finally, we assumed that certified public accountants would be aware of the limits of their skills and would recommend counsel whenever the complexities of a particular return indicated that need. *Ibid.*

Finally, we note that our own Rules recognize certain exceptions to what used to be the absolute prohibition against the practice of law by non-lawyers. *Rule* 1:21–3(a) allows law school graduates to appear in court to answer the calendar call for the firm employing them, obviously a practical recognition of the benefits measured against the minimal risks. *Rule* 1:21–3(b) is broader, allowing third-year law-school students and graduates to appear before a court or an agency as part of a program approved by this Court, the programs generally aimed at supplying needed legal resources to public agencies and to organizations serving the disadvantaged. Another aspect of the public interest involved in this latter exemption is the better training of law school students, for, as we recognized in *In re Determination of Executive Commission on Ethical Standards,* 116 *N.J.* 216, 218, 561 *A.*2d 542 (1989), "[c]linical training is one of the most significant developments in legal education." The rule is designed to afford that training by

enabling students to become "skilled [not only] in analysis" but "in serving client needs." *Id.* at 219, 561 *A.*2d 542.

Our holding today, therefore, accords with the Court's consistent treatment of this issue. Although technically we have overruled the holding of *Northern New Jersey Mortgage Associates, supra,* 32 *N.J.* 430, 161 *A.*2d 257,[4] that case applied precisely the same standard in passing on the challenged conduct before it—the public interest. As we view it, the real difference is found in the differing records before the Court in the two cases, for in that case the public interest in allowing the challenged practices to continue was apparently nowhere demonstrated, and certainly not with the force of the record before us. Indeed, since the practice challenged apparently related solely to one firm located in North Jersey, and not to the South Jersey practice, it may have seemed that such showing would be irrelevant. More than that, at the time of our decision in that case, we had not yet ruled that brokers could prepare contracts of sale, a change which has affected the entire landscape in this area.

■ In this case, the record clearly shows that the South Jersey practice has been conducted without any demonstrable harm to sellers or buyers, that it apparently saves money, and that those who participate in it do so of their own free will presumably with some knowledge of the risk; as Judge Miller found, the record

---

[4] Our holding in this case allows a title company, under certain conditions, to prepare bonds and mortgages not only when it is a party to the transaction (as lender or mortgagee) but when requested to do so, acting on behalf of the mortgagee; the final judgment approved by this Court in *Northern New Jersey Mortgage Associates, supra,* prohibits the latter. *See New Jersey State Bar Ass'n v. Northern N.J. Mortgage Assocs.,* 34 *N.J.* 301, 169 *A.*2d 150 (1961) (modifying the initial injunction entered after our decision in the same case, 32 *N.J.* at 430, 161 *A.*2d 257, in order to conform with that decision). Our holding in this case allows the title company, and others, to participate in the preparation of various legal instruments, including conveyances, under certain conditions; the final judgment in *Northern New Jersey Mortgage Associates, supra,* 32 *N.J.* at 430, 161 *A.*2d 257, prohibits it. Our holding permits title companies to take certain legal steps to remove certain kinds of objections to title or to cure defects therein; the final judgment in *Northern New Jersey Mortgage Associates, supra,* prohibits it.

fails to demonstrate that brokers are discouraging the parties from retaining counsel, or that the conflict of interest that pervades the practice has caused material damage to the sellers and buyers who participate in it. Given that record, and subject to the conditions mentioned hereafter, we find that the public interest will not be compromised by allowing the practice to continue. We note again that our prior decisions and those of the Committee on this issue did not have the benefit of such a record and were premised on the irrefutable finding that the activities of the non-lawyers in the South Jersey practice constituted the practice of law. That they do, but with the benefit of the record before us it is equally clear that the practice does not disserve the public interest.

Of decisive weight in our determination is the value we place on the right of parties to a transaction to decide whether or not they will retain counsel. · We should not force them to do so absent persuasive reasons. Given the importance in our decision of the assumption that the parties have chosen not to retain counsel, and without coercion have made that decision, we have attached a condition to the conclusion that the South Jersey practice does not constitute the unauthorized practice of law. The condition is designed to assure that the decision is an informed one. If that condition is not met, the brokers (and title officers, if aware of the fact) are engaged in the unauthorized practice of law, and attorneys with knowledge of that fact who participate are guilty of ethical misconduct. That ruling is similar to the clear implication in the brokers' and accountants' cases that unless those professions conform to the conditions mentioned in those decisions, they will be guilty of the unauthorized practice of law. *New Jersey Ass'n of Realtor Bds., supra,* 93 *N.J.* at 472, 461 *A.*2d 1112 ("[L]icensed real estate brokers and salespersons shall be permitted to prepare certain types of residential sales and lease agreements *if these agreements contain specified provisions.*" (emphasis added)); *In re Application of N.J. Soc'y of Certified Public Accountants, supra,* 102 *N.J.* at 242, 507 *A.*2d 711 (permitting certified public accountants to prepare and file inheritance tax

returns "subject to the condition" that client be notified in writing that review by counsel may be desirable).

The public needs protection in these matters. The Legislature has recognized such need and afforded statutory protection for both buyers and sellers at various stages of the real estate transaction. *N.J.S.A.* 46:3B–1 to –20 (New Home Warranty and Builders' Registration Act); *N.J.S.A.* 45:15–1 to –42 (Real Estate Broker Regulations); *N.J.S.A.* 45:22A–1 to –20 (Retirement Community Full Disclosure Act); *N.J.S.A.* 45:22A–21 to –56 (Planned Real Estate Development Full Disclosure Act); *N.J.S.A.* 17:46B–1 to –62 (Title Insurance Act); *N.J.S.A.* 46:10A–6 ("closed shop law" providing that mortgage lenders cannot require borrowers to employ their attorney or to pay lenders' attorney fees and that lenders must also disclose that their attorney works for them and that borrowers should retain their own attorney). In addition, Congress has recognized the need for uniformity in consumer real estate transactions. 12 *U.S.C.A.* §§ 2601–2617 (Real Estate Settlement Procedures Act); 15 *U.S.C.A.* §§ 1601–1693 (Truth in Lending Act); *see* Gerald S. Meisel, *RESPA: Federal Control of Residential Real Estate,* 98 *N.J.L.J.* 713 (August 21, 1975).

We do not here adopt a "consumerism" that invariably requires that services be made available at the lowest price no matter how great the risk. The record suggests that despite their conflict of interest, brokers' ethical standards have resulted in some diminishment of those risks. Unlike prior cases, there is no finding here, for instance, that brokers are discouraging retention of counsel, no suggestion that title companies are paying rebates to referring brokers. Today's public, furthermore, not only has the benefit of the attorney-review clause, but is presumably better educated about the need for counsel, the function of attorneys, and the legal aspects of the sale of the home. The public continues, in South Jersey, to choose not to be represented. We assume that the public has simply concluded that the perceived advantages are worth those risks.

We do not adopt a rule, however, that so long as informed consent from the parties is obtained, any conduct that might otherwise constitute the unauthorized practice of law is permitted. Most of the practices restricted to attorneys can be performed, and may be performed, only by them regardless of the informed consent of the parties and regardless of the lower cost of using non-attorneys. All we decide is that in *this* case, concerning *this* practice, the record demonstrates that the public interest will not be compromised by allowing what would otherwise be the unauthorized practice of law if the parties are adequately informed of the *conflicting* interests of brokers and title officers and of the risks involved in proceeding without counsel.

We emphasize the nature of the public interest standard applied in this case. It is the same as in the cases allowing brokers to prepare real estate sales contracts and certified public accountants to prepare inheritance tax returns. No suggestion was made or implied in those cases that the public was better served if they used brokers and certified public accountants rather than lawyers for the services involved. On the contrary, the conditions imposed by this Court in both—requiring that the parties be informed in advance of their right to retain counsel—reflect our judgment that the parties would be well advised to obtain counsel. We decided only that the protection that lawyers provide and parties need— the basic rationale for prohibiting the unauthorized practice of law—was sufficiently addressed in those cases by assuring that the parties knowingly rejected it; we decided only that the public interest in those cases did not require depriving parties of their right to proceed without counsel, did not require the protection of counsel against their will. That is all we decide here today. We do *not* conclude that the public is better off without lawyers in the South Jersey practice. As stated several times above, we firmly believe the parties *should* retain counsel. We decide only that given the history and experience of the South Jersey practice, the public interest will not be disserved by allowing the parties, after advance written notice of their right to retain counsel and the risk of not doing so, to choose to proceed without a lawyer; we decide

only that the public interest does not require that the protection of counsel be forced upon the parties against their will. Our required disclosure notice goes beyond that of other cases, reflecting our determination to assure that the parties who decide not to retain lawyers know the conflicting interests of others and know that there are risks of proceeding without one.

There is a point at which an institution attempting to provide protection to a public that seems clearly, over a long period, not to want it, and perhaps not to need it—there is a point when that institution must wonder whether it is providing protection or imposing its will. It must wonder whether it is helping or hurting the public.[5] We have reached that point in this case. Although we have strong doubts, the evidence against our doubt requires that we allow this practice to continue with some form of added protection, recognizing, however, that like the attorney-review clause, the added protection may not be effective.

## IV

### Conclusion and Conditions

We premise our holding on the condition that both buyer and seller be made aware of the conflicting interests of brokers and title companies in these matters and of the general risks involved in not being represented by counsel. We shall ask the Civil Practice Committee to recommend to us practical methods for achieving those aims. Presumably, that Committee will want to form a subcommittee including those who have been involved with this problem for many years. Obviously, the best way to achieve the goal is to have a knowledgeable disinterested attorney sit down with both buyer and seller and carefully explain both the

---

[5] We note that in Arizona, after its Supreme Court prohibited brokers from preparing real estate sales contracts, the people approved a constitutional amendment that provided that licensed real estate brokers "shall have the right to draft or fill out and complete" real estate documents, including deeds, mortgages, and contracts of sale. *Ariz. Const.* art. XXVI, § 1.

conflict factor and the risk factor, but we doubt if that would be practical. Pending the report of that Committee and our action on it, we have decided to adopt an interim notice requirement that the broker must comply with. If that notice is not given, the broker will be engaged in the unauthorized practice of law. Furthermore, anyone who participates in the transaction, other than buyer and seller, knowing that the notice has not been given when and as required, will also be engaged in the unauthorized practice of law. As for any attorney who, under the same circumstances, continues to participate in the transaction, that attorney will also be subject to discipline for unethical conduct. At the commencement of the closing or settlement, the title officer in charge shall inquire of both buyer and seller whether, how, and when, the notice was given, and shall make and keep a record of the inquiry and the responses at that time.

The interim notice that we require is attached as Appendix A.[6] It is a written notice, and it shall be attached to the proposed contract of sale as its cover page. The notice may be appropriately revised if the broker represents the buyer or is a dual agent, one who represents both seller and buyer. Whenever a broker presents either buyer or seller with the proposed contract, that cover page shall be so attached, and the broker shall personally

---

[6] We note that title companies are required to disclose to the buyer the desirability of seeking counsel to review title exceptions. *N.J.S.A.* 17:46B-9. This disclosure was revised as of August 1, 1994 to include the warning that the title company does not represent the buyer and cannot offer legal advice. However, because this disclosure does not address the role of the broker, and is only required to be mailed five days prior to closing, we believe it does not provide adequate protection for the buyer.

We also note that the New Jersey State Bar Association and the New Jersey Association of Realtors have each submitted their own proposed forms of disclosure. These forms have been taken into consideration in preparing the interim disclosure included in Appendix A. We believe that disclosure most adequately assures the protection of the public interest.

We are aware of the adoption of *N.J.A.C.* 11:5-1.43, effective July 1, 1995, requiring certain written disclosures in real estate transactions. 27 *N.J.R.* 705 (Feb. 21, 1995). We do not find those disclosures inconsistent with our interim notice.

advise the buyer or seller at that point that he or she must read it before executing the contract. If the contract is not personally delivered by the broker to the buyer or seller, the broker must make certain, prior to such delivery, that buyer and seller have been so informed, and must do so by speaking to them personally or by phone.

Assuming such notice is given in accordance with the terms and conditions mentioned above, we hold that attendance and participation at the closing or settlement where neither party has been represented by counsel, or where one has not been so represented, does not constitute the unauthorized practice of law; that brokers may order abstracts, title binders, and title policies; that an attorney retained by the broker to draft a deed and/or affidavit of title for the seller may do so but only if the attorney personally consults with the seller; regardless of the prior restriction, any attorney retained by the broker for that purpose, or any attorney acting for the title company, may draft any of the documents involved in the transaction upon written request of the party, be it buyer, seller, lender, mortgagee, bank, or others;[7] that the title company may participate in clearing up those minor objections which Judge Miller refers to as categories one and two: standard exceptions such as marital status and money liens customarily paid at closing, but not those classified as categories three and four: easements, covenants or other serious legal objections to title.

■ Other equally important protections for buyer and seller should exist. Any broker participating in a transaction where buyer and seller are not represented should have the experience and knowledge required at least to identify a situation where independent counsel is needed. Under those circumstances the broker has a duty, in accordance with the standards of that profession, to inform either seller or buyer of that fact. *N.J.A.C.*

---

[7] Of course, the title company may continue to prepare non-conveyance documents such as the settlement statement.

11:5–1.23(a), (f). Presumably, the same duty applies to any title officer, whether or not an attorney, but especially if an attorney, who becomes aware of the need of either party for independent counsel. In addition to whatever potential action might be taken by the bodies that regulate brokers and title officers, as well as by their own associations, their failure to inform exposes them to the risk of civil liability for resulting damages.

Judge Miller's report included the following additional recommendations: that this Court create a committee on real estate practice; that a separate certification be established for real estate attorneys; and that settlement companies be under the supervision of a public entity.

We believe that the Civil Practice Committee can perform the function of a committee on real estate practice through a subcommittee. As to certification of real estate attorneys, we refer that matter to the Trial Attorney Certification Board.

Concerning settlement companies, as we read the record, they appear to be nothing more than individual brokers, attorneys or title officers performing their roles through a corporation. We request that the Civil Practice Committee make a recommendation concerning the regulation of these entities.

In addition, Judge Miller recommended the following, all of which we refer to the Civil Practice Committee for review and report: any unrepresented buyer or seller must execute a written waiver of the right to have counsel; both the broker and title agent must urge buyers and sellers to retain attorneys; the parties conducting a closing must be under the supervision of a public entity; brokers should be required to carry adequate liability insurance.

Concerning the prior paragraph, we believe that the disclosure required in this opinion, or such disclosure as the Civil Practice Committee may recommend, may render such added protection unnecessary. While we are concerned about, and determined to afford, adequate protection for buyers and sellers, we do not want

to burden the real estate transaction process with detailed requirements that do not add measurable protection.

As in *New Jersey State Bar Association v. New Jersey Association of Realtor Boards*, 93 *N.J.* 470, 461 *A.*2d 1112 (1983), we note that this Court is available to modify our judgment in this matter if the underlying circumstances change or if our resolution of the matter proves either impractical or unwise. As we have noted in this opinion, we have accepted Judge Miller's conclusion that the evidence does not warrant a finding that brokers are discouraging parties from retaining counsel. We assume that the massive failure to retain counsel, including the failure of the parties to avail themselves of the three-day cancellation clause, does not stem from any conspiracy on the part of brokers, but is most likely explained by the common knowledge in that area that most of these matters are handled without counsel and the general level of satisfaction with the situation. We leave it to the organized bar to keep itself informed of those circumstances. If it can be shown at some future date that the South Jersey practice results not from this common understanding, but rather from active discouragement by brokers, this Court will consider appropriate action, including revision of our determination. By allowing the South Jersey practice to continue, this Court does not in any way cede its power over the practice of law. The Court reserves the right and power, depending upon the circumstances, to prohibit that which is permitted under this opinion, or to impose restrictions and conditions in addition to those set forth above.

Our decision, while allowing continuation of the South Jersey practice, imposes new conditions on that practice and serious consequences for non-compliance. In order that brokers and others may adjust their practices to comply with those conditions, our decision will not become effective until sixty days from the date of this opinion and will apply to all real estate contracts subject to this opinion that are thereafter executed and to the transactions based on those contracts.

The decision of the Committee, Opinion No. 26, is affirmed in part, and reversed in part, and judgment entered declaring the rights of the participants in New Jersey residential real estate transactions in accordance with this opinion.

*For affirmance in part, reversal in part*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—6.

*Opposed*—None.

## APPENDIX A

### NOTICE

#### To Buyer and Seller:

#### *You Must Read This Notice Before Signing the Contract*

The Supreme Court of New Jersey requires real estate brokers to give you the following information before you sign this contract. It requires us to tell you that you must read all of it before you sign. Here is the information for both buyer and seller:

1) I am a real estate broker. I represent the seller. I do not represent the buyer. The title company does not represent either the seller or the buyer. Furthermore, both the seller and the buyer should know that it is in my financial interest that the house be sold and that the closing be completed. My fee is paid only if that happens. The title company has the same interest, for its insurance premium is paid only if that happens.

2) I am not allowed, and I am not qualified, to give either the seller or the buyer any legal advice. Neither the title company nor any of its officers are allowed to give either the seller or buyer any legal advice. Neither of you will get any legal advice at any point in this transaction unless you have your own lawyer. If you do not hire a lawyer, no one will represent you in legal matters either now, or at the closing. I will not represent you and the title company and its officers will not represent you in those matters.

3) The contract attached to this notice is the most important part of the sale. It determines your rights, your liabilities, and your risks. It becomes final when you sign it—unless it is cancelled by your lawyer within three days—and when it does become final you cannot change it, nor can any attorney you may hire thereafter change it in any way whatsoever.

4) The buyer especially should know that if he or she has no lawyer, no one will be able to advise him or her what to do if problems arise in connection with the

purchase of this property. Those problems may be about various matters, including the seller's title to the property. They may affect the value of the property. If either the broker or title company sees that there are problems and that because of them you need your own lawyer, they should tell you. However, it is possible that they may not recognize the problems or that it may be too late for a lawyer to help. Also, they are not *your* lawyers, and they may not see the problem from your point of view.

5) Whether you, seller or buyer, retain a lawyer is up to you. It is your decision. The purpose of this notice is to make sure you have some understanding of the transaction, the risks, who represents whom, and what their interests are, when you make that decision. The rules and regulations concerning brokers and title companies prohibit each of them from suggesting that you are better off without a lawyer. If anyone makes that suggestion to you, you should carefully consider whose interest they are serving. The decision whether to hire a lawyer to represent your interests is yours and yours alone.