## IN THE MATTER OF JOHN S. CONROY, III, AN ATTORNEY AT LAW.

Argued May 7, 1968 and May 5, 1970—Decided June 23, 1970.

*Messrs. Anthony P. Tunney, Jr.* and *William V. Webster, Jr.* argued the cause for the Burlington County Ethics Committee.

*Mr. Henry F. Gill* argued the cause for respondent.

PER CURIAM. The Burlington County Ethics Committee filed two presentments with this Court charging respondent, John S. Conroy, III, with unethical conduct.

I

The first presentment arises out of a personal injury negligence case which respondent was retained to handle. In April 1967, Mr. Conroy had a conference with his clients, husband and wife, in connection with an offer of a $2500 settlement which had been proposed by the insurance carrier covering the tortfeasor. After being advised that the attorney's fee would be $800, the clients authorized acceptance of the offer and shortly thereafter signed the necessary releases in respondent's office.

Thereafter many telephone calls and three personal visits were made by the husband to the Conroy office for the purpose of obtaining the proceeds of the settlement. Respondent was not available. On August 23, 1967, after inquiry of the insurance carrier, the husband learned that the settlement check drawn to him, his wife and the respondent had been issued on May 2 and cashed shortly thereafter. The names of all three payees had been endorsed by Mr. Conroy and on May 5 the check was marked "For deposit. Esc. Acct. No. 44–6025." On August 23, the husband was advised by respondent's secretary that he was in Florida, that their names had been endorsed on the settlement check pursuant to their power of attorney and that the check had been deposited. No money having been received by August 29, the clients filed the present complaint under oath with the Ethics Committee.

Before respondent knew of the complaint and before it was served on him, but after he had received a letter from a county judge concerning the matter, he arranged for another member of the bar to aid him in disbursing the settle-

ment proceeds to complainants. Within a few days thereafter respondent went to his clients' home and explained that since he had been their attorney for ten years he assumed that at the time of his retainer in the case he had taken a power of attorney from them to endorse and deposit any settlement check. He informed them also that the delay in making the disbursements was due to his illness, a vacation in Florida and his inability to get in touch with them. In any event, on this occasion he gave them the full proceeds of the settlement without deducting the $800 which he had told them earlier would be the amount of his fee for services. The clients apparently were satisfied and then sought unsuccessfully to withdraw their complaint to the Ethics Committee.

At the Committee hearing, Conroy said it was his practice in negligence cases to use a form of retainer which contained a power of attorney to endorse the client's name on the settlement check, deposit it and make the appropriate disbursements after it had cleared. The form of such retainer used by him was put in the record. It says in part:

He is to have full power * * * to execute any draft or check in ——————— behalf and to make disbursements of the proceeds covering all medical and hospital bills and to retain ——————% of the total recovered if settled and ————% if trial is had.

In this case it was Conroy's recollection that he had given the retainer form to one of the clients, the other not being present at the time, and had requested him or her to take it home for signature and to return it to him. He believed it was returned to him thereafter duly signed, but he could not locate it in his file or office. On the basis of his belief that he held the power of attorney, he endorsed and deposited the settlement check. However, both clients denied they had ever signed such an authorization. The Committee found "as a fact that Mr. Conroy did not have a power of attorney." But it did not find one way or the

other as to whether he honestly believed such power of attorney had been signed and delivered to him.

We pause at this point to make clear that we consider employment by members of the bar of the type of retainer and power of attorney described above to be highly improper. The practice of insurance carriers or other settlors in drawing settlement checks in the joint names of the attorney and the claimants is to protect and preserve the interests of all three parties to the transaction. The form of retainer in question facilitates the subversion of that purpose and is unqualifiedly disapproved.

Returning to the settlement check, after endorsement by Conroy, as noted above it was marked for deposit in "Esc. Acct. No. 44–6025." The impression conveyed by the endorsement is that the deposit was made in an escrow or trust account. Actually, account No. 44–6025 was in the Beach Haven National Bank & Trust Company, Beach Haven, N. J. in the name of Evelyn S. Conroy, respondent's wife, whose address is listed on the account as N. E. 5th Ave., Boca Raton, Florida. The bank record shows deposit of the $2500 check in that account on May 5, 1967. It reveals also that 26 checks of varying amounts drawn thereon were paid by May 31, leaving a balance in the account of $59.79. These paid checks were not produced before the Ethics Committee, nor were their purposes shown. It is plain, however, that none of them represents remittance to respondent's clients.

Respondent sought to explain the use of the bank account in his wife's name by saying that he was having difficulty with the Internal Revenue Service, and he did not want to run the possible risk of having funds in his possession belonging to clients made subject to federal action of some nature. He testified further that he had accumulated a sum of money in cash in his office. He took $1688 of that cash, representing the balance due his clients after deducting his fee of $867 from the $2500, placed it in an envelope

marked with his clients' name, and put it in his "office file safe."

On May 5 or 6 he went to Ohio for five or six days. On his return he tried unsuccessfully to reach his clients. The reason for not making the disbursement at that time was because there were some problems connected with medical bills arising out of the accident. In addition he said they owed him some fees for services in other matters. Then he left for Florida and for health reasons became unable to return to his practice except on a part time basis until November. He said he was out of the office most of June and July and all of August. Respondent testified also that he informed his secretary about the clients' cash being in the office file about a month after he put it there and gave her instructions in connection with disbursement when and if the clients made contact with her. According to the clients they made many unsuccessful attempts to communicate with him.

Respondent's then secretary testified that he told her in August 1967 about the clients' cash being in an envelope in an unlocked filing cabinet. There is much confusion and contradiction between her testimony and that of respondent on the matter. Among other things she said that, pursuant to instructions, at one time she took half the cash out of the envelope and delivered it to a local law firm. The record makes it clear that the payment was in another case. It is clear also that when this was done the cash balance in the office envelope was less than that necessary for a proper disbursement to the clients in the present matter. In any event, as indicated above, within a short time after the county judge's intervention respondent turned over the full $2500 in cash to his clients, without deducting his fee.

In its original presentment the Committee found that the reasons given by respondent for withdrawing the fund from the bank and depositing cash in his safe were "implausible." It further found "that he did not advise his clients of the fact that he had received the check, deposited the same, and had withdrawn the funds." In a supplemental report follow-

ing a remand by us to permit additional consideration of the problem, the Committee said:

The additional testimony does not clearly indicate that Mr. Conroy converted the money to his own use. The Secretary's testimony, however, did indicate that there was less than enough in the envelope after withdrawing the money due on the settlement [the reference here is apparently to the cash withdrawal therefrom to make the payment in the unrelated case] to satisfy the claim.

The Committee is satisfied that Mr. Conroy was utterly reckless in handling client's funds and not only exposed them to the danger or being impounded by the Internal Revenue Service but handled them in such a way that the funds could not be identified and so that no one could tell whether they had or had not been converted to his use and in this he was guilty of unethical and unprofessional conduct.

In addition the Committee pointed out in both presentment reports that respondent had not maintained a trust account and that the evidence established that he had violated Canon 11 of the Canons of Professional Ethics. That Canon in part provides as follows:

"Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly and should not under any circumstances be commingled with his own or be used by him."

We agree that the proof in the case taken in the most favorable light for respondent clearly supports the presentment. In fact, in our judgment, the proof in its totality establishes that after depositing the $2500 settlement check in the account maintained in his wife's name, Conroy, by a series of withdrawals over a very short period of time thereafter, used the proceeds for his own purposes. We reiterate that a violation of Canon 11 must be regarded as a serious breach of an attorney's obligations and that "funds in the hands of an attorney that belong to a client or others must be kept inviolate." *In re Banner,* 31 *N. J.* 24, 27 (1959).

## II

In the second presentment the Committee found respondent guilty of unprofessional conduct in that he accepted a fee for services to be rendered in connection with his client's desire to obtain a divorce and to have bankruptcy proceedings instituted for him. It concluded that thereafter respondent disregarded numerous requests for information from his client, that he did not perform the services and that he did not return the retainer fee.

There is no dispute that respondent was engaged in November 1965 by the client for the purposes indicated. There is some conflict as to the sum paid to Conroy but the Committee, whose conclusion is amply supported by the evidence, found it to be $1325 for both the divorce and the bankruptcy proceedings. Conroy was to engage a detective to investigate in aid of the divorce and to pay him out of the $1325.

Respondent hired a detective but the investigation did not produce evidence of the client's wife's infidelity. Whether the client had furnished any other proof does not appear. In any event neither the divorce suit nor the bankruptcy proceedings were ever instituted. Respondent indicated that after much lapse of time the client decided against bankruptcy.

The client testified that he found it impossible to maintain any kind of communication with Conroy. When he did make contact he was told that respondent was "working" on his matters. In February 1968, he talked to respondent after he had filed a complaint with the Ethics Committee. Soon thereafter Conroy visited him and he agreed to give Conroy an extension of time until September 1968 "to make everything final." Respondent wrote and both of them signed a statement, the tenor of which was that the client accepted Conroy's assertion that he had been ill and out of his office. It noted also that the divorce would be proceeded with "dependent on securing of evidence," and the bankruptcy "to await the divorce." Finally it stipulated that the divorce action "is to be started before Easter and to be final as per

law, which is computed to be at the end of September 1968." In spite of this agreement the client did not hear from respondent, and on April 14, 1968 he telegraphed the Ethics Committee renewing his complaint. This was about two and a half years after respondent had been retained.

At the hearing on the complaint respondent conceded that he was engaged in connection with a desired divorce and bankruptcy. He testified that he advised the client that he would have to procure proof to support his suspicions of his wife's infidelity and that it would be necessary to hire a detective. Detectives were engaged thereafter but they were not successful in turning up evidence of her misconduct. Nevertheless Conroy paid them a total of $550. He testified also that on four or five occasions he accompanied a detective in the course of the investigation.

With respect to the bankruptcy proceeding, respondent said his client never supplied him with enough information to enable him to proceed. He said also that the client was moving around, that he had difficulty keeping track of him, and finally that he was told to withhold further action. It did appear at the hearing that the client had straightened out his financial affairs and no longer wished the petition filed. Therefore, he felt some part of the fee paid to respondent should be returned.

Respondent conceded that he had never started the divorce proceedings, and indicated that supporting proof was never available. However, after the present complaint was filed he had recommended another attorney to his client, but the client had failed to communicate with the attorney. Apparently Conroy never took any active steps in that direction either, and never sent his file to the suggested attorney. He testified that he had been ill for some time suffering with hypertension, and consequently out of his office for considerable periods.

With respect to the balance of the fee received, he asserted that he had earned it in other matters for the client. For example, the client was under a Juvenile and Domestic Re-

lations Court order to support his wife. Upon being cited for contempt for failure to comply, Conroy represented him and ultimately secured a reduction in the amount of weekly support. He never sent a bill for these services but informed us at the oral argument of the presentments that a reasonable fee would be $300. In addition, his client faced a complaint of the Department of Unemployment Security in the Hamilton Township Municipal Court for non-payment of unemployment compensation taxes. Respondent represented him in that proceeding. He asserted the reasonable value of the services for $350. However, he never sent a bill therefor. For the services rendered in the proposed divorce action he felt he had earned $300, and a further $200 for additional services rendered in the Juvenile and Domestic Relations Court including conferences in Camden about the matter with the judge of that court. Again no bills were ever rendered. Finally he said he had agreed with his client to pay the recommended attorney whatever reasonable fee and costs were incurred for the projected divorce action. For these reasons he claimed that his client was not entitled to any refund out of the total retainer received.

The Committee did not pass upon the question of the alleged earned fees. Nor do we deem it necessary to do so. It found that respondent did not render the particular services he was engaged and paid to perform, *i. e.,* the divorce and bankruptcy proceedings, that he made "numerous misrepresentations" to his client with respect thereto, and that the failure to perform or to reimburse the client constituted unethical conduct. We are satisfied that the evidence supports the conclusion.

### III

Under the circumstances respondent is suspended from the practice of law for a period of one year and until the further order of this Court.

It is obvious from the record that the client involved in the second presentment is entitled to a return of part of the

fees received by Conroy for performance of the two specific matters which brought about these proceedings. Although some services were rendered and certain disbursements were made in the divorce matter, nothing appears to have been done during the long period before the client decided to abandon the bankruptcy action. Accordingly, respondent must bear the burden of making a fair adjustment of the fees paid to him for the two matters. On any application for reinstatement after expiration of the year suspension, we shall expect him to make a proper showing respecting his adjustment of the fee issue with his client. As indicated above, we do not pass upon respondent's suggestion that certain fees on other matters are due him. Any such obligation on the part of the client may be made the subject of an independent claim, if respondent so desires.

*For suspension for one year*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*Opposed*—None.