677 A.2d 1100

IN THE MATTER OF ADVISORY COMMITTEE ON
PROFESSIONAL ETHICS DOCKET NO. 22–95.

Argued March 11, 1996—Decided June 13, 1996.

*Nola R. Bencze* argued the cause for appellants New Jersey State Bar Association, Bar of the Special Civil Part and Commercial Collection Agency Section of the Commercial Law League of America (*Jamieson, Moore, Peskin & Spicer,* attorneys).

*Alfred E. Ramey, Jr.,* Assistant Attorney General, argued the cause for respondent Advisory Committee on Professional Ethics (*James J. Ciancia,* Acting Attorney General of New Jersey, attorney).

PER CURIAM.

The issue raised in this appeal is whether a law firm that concentrates its practice in the field of collections law may, upon receiving checks payable to its clients, endorse the checks and deduct the firm's contingent fees where the client consents to that practice in the retainer agreement but does not thereafter expressly authorize the deductions with full knowledge of the total amounts collected.

In response to a formal inquiry, the Advisory Committee on Professional Ethics (ACPE) concluded that a law firm may not, upon receiving checks on behalf of its clients, endorse the checks in its clients' names or deduct its contingent fees without the clients' express consent after full disclosure without violating Rule of Professional Conduct (*RPC*) 1.15(c) as explicated in *In re Advisory Committee on Professional Ethics Opinion 635,* 125 *N.J.* 181, 592 *A.*2d 1210 (1991) (*IMO Opinion 635*), and *Advisory Committee on Professional Ethics and Committee on Attorney Advertising Joint Opinion 666/14,* 132 *N.J.L.J.* 210 (1992) (*Joint Opinion 666/14*). We granted a Petition for Review. 144 *N.J.*

371, 676 *A.*2d 1088 (1995). We now modify the ACPE decision to permit the existing collections law practices to continue.

## I

### -A-

In April 1995, the ACPE received a request for an advisory opinion filed on behalf of the New Jersey State Bar Association, the Bar of the Special Civil Part, and the Commercial Collection Agency Section of the Commercial Law League of America (CLL). The interested groups inquired with respect to the issues previously stated because many of their members were conducting their collections law practice in the manner described in the inquiry. They sought to obtain a clarification as well as an exemption from *Joint Opinion 666/14* for law firms and lawyers that concentrate in collections law.

An advisory opinion was requested because in 1992 the ACPE and the Committee on Attorney Advertising (CAA) issued *Joint Opinion 666/14* in response to two grievances filed against law firms due to their use of questionable direct-mail solicitation letters to real property owners. Those letters invited property owners to consider appealing their 1992 property tax assessments. The ACPE reviewed the solicitation letters and found that the law firms in question had violated *Rule of Professional Conduct* 1.15(c) through a provision in the solicitation letters that authorized the law firm to deduct its contingent fees from refund checks without further notice and authorization from the property-owner clients.

*Rule of Professional Conduct* 1.15(c) requires that a lawyer in possession of property in which another person claims an interest keep the property separate until there is an accounting and severance of interests. *Joint Opinion 666/14* concluded that implicit in 1.15(c) is the requirement that a client be informed of the settlement or other resolution of the client's matter, the

amount of the settlement or judgment, and the amount of the fee to be deducted by the attorney. The opinion stated:

> The attorney will not know whether the client is satisfied with his or her handling of the case or the results obtained, and therefore refuses to pay the agreed upon fee, until the client is provided with complete information concerning the resolution of the matter. Consequently, an attorney may not withdraw his or her fee absent the client's consent after full disclosure.
>
> [*Joint Opinion 666/14, supra,* 132 *N.J.L.J.* at 267.]

-B-

Debt collection is a very large business. The Commercial Collection Agency Section of the CLL estimates that its members processed 2,626,493 claims valued at $3.412 billion in 1994. Approximately 893,000 of those claims worth $1.330 billion were forwarded to attorneys for handling. It is not unusual for a New Jersey law firm that concentrates in collections law to handle over 70,000 payments in a single year.

Many companies perform the majority of their collections work in-house. Certain delinquent accounts, however, can be most effectively and efficiently handled by collections attorneys in the state in which the debtor resides. Therefore, companies will often retain law firms that concentrate in collections litigation to handle delinquent accounts. For example, one New Jersey law firm handles over 1,000 cases for First Card Services, Inc. and over 500 cases for National Westminster Bank at any given time.

The most common practice in the area of debt collections is to handle claims on the basis of a contingent fee arrangement. Typically, an attorney will enter into a contingent fee arrangement with a client after receiving a file that has been identified by the client as a delinquent account.

Most often, institutional clients dictate the collection arrangements by sending the attorney a retainer letter that includes the terms of the representation. The retainer letters usually provide that no act to compromise a claim will be taken by the attorney without the express authorization of the client. In addition, the retainer letters typically authorize the law firms to endorse pay-

ment orders that list the client as payee. The clients generally authorize their attorneys in advance to deduct the attorneys' contingent fees before disclosing the amount of funds received or the precise amount of fees earned. For example, the retainer letter written by the New Jersey Higher Education Assistance Authority (NJHEAA), the State agency that oversees repayment of NJHEAA guaranteed loans, provides:

> You agree to deposit all monies collected by you from various account debtors in an attorney's trust account, maintained by you. To enable you to make such deposits, this letter (when accepted by you) shall constitute your authority to endorse any check, money order or payment made payable to the NJHEAA or the State of New Jersey, tendered to you and referable to an account referred to you for collection pursuant to the terms of this letter agreement, for deposit in a trust account as aforesaid.... The contingent fee will be payable out of the amounts collected by you from a particular account and may be deducted by you from the gross collection proceeds in that account, prior to your remittance of the balance to the NJHEAA.

In many instances, after an institutional client authorizes its attorneys to resolve a given matter for a liquidated amount, the client allows its attorneys to collect the outstanding debt in installments. For the most part, the collections that do occur result from voluntary payment arrangements made with a debtor, wage executions, and stipulations of settlement. Rarely does a debtor pay the entire outstanding amount at once. The vast majority of collections result from voluntary monthly payment arrangements with debtors until the debt is paid. It is estimated that more than 90 percent of the debtors of the NJHEAA make monthly payments for periods ranging from six months to ten years or more.

It is common practice for a collections attorney to advise a debtor to make his or her checks or money orders directly payable to the client-creditor rather than the law firm. Attorneys frequently have separate trust accounts for each of their major clients. When a debtor makes a check payable to the client rather than to the attorney, it facilitates the depositing of the check from the debtor into the correct trust account and the posting of payment to both the creditor's and debtor's accounts.

Most attorneys concentrating in collections law remit payments to their clients once a month. The practice is to send clients a single check representing all payments collected during the month after deducting fees earned. In addition to the money, the attorneys typically send their clients a list with the debtors' account numbers, names, and the amount of the payments received. The clients, however, do not separately acknowledge each of their debtors' monthly payments. Nor do they give a separate authorization for the contingent fees to be deducted from each debtor's payment.

In addition to directly receiving files from clients, the attorneys often receive files from "forwarders." Pursuant to § 1.3 of the Operative Guides for Forwarders and Receivers Adopted by the CLL (Operative Guides), a forwarder is a person or an entity that acts as an agent on behalf of a creditor in the referral of claims for collection. The attorney retained for purposes of collection is a "receiver." Once the receiver accepts the claim from the forwarder, the full attorney-client relationship exists between the receiver and the creditor.

Regardless of whether attorneys are hired by clients directly or through forwarders, their fees are contingent on the funds collected from the debtors and are based on pre-determined percentages. For example, the NJHEAA typically pays no fees in advance to its collections attorneys; rather the attorney receives 25% of the sums collected from each debtor.

II

-A-

Petitioners argue that it would be commercially unreasonable not to permit collections attorneys to endorse checks on behalf of their clients. According to the collections bar, the requirement of having to forward to the creditor thousands of checks made payable to the client would be unduly burdensome and impractical. Moreover, with respect to many of the payments received, the

client is not entitled to the full amount of the payment because of court costs. Finally, they contend that it would be a mistake to tinker with procedures that have proven to be fair and effective for over forty years without disciplinary violations.

Petitioners argue persuasively that many clients prefer to grant their collections attorneys the power to deposit all monies collected from their various account .debtors. Frank Zarragoita, Vice President of First Card Services, Inc., explained why he believed it was in the best interests of his employer to authorize collections attorneys to endorse checks made payable to First Card Services:

> At the present time our New Jersey law firm, ... is handling over one thousand (1,000) cases for FCS. That number is typical of the volume of claims handled on our behalf by them. In order for us to separately acknowledge each of the many monthly payments which they receive on our behalf and to provide particularized authorization for them to endorse and deposit the same would require an extraordinary amount of unnecessary effort and unquestionably reduce the efficiency at both our office and that of our attorney, and, as a result, significantly increase our expense to no one's advantage. Moreover, from the point of view of cash flow, such a requirement would likely delay the deposit of said funds and have the potential to increase the number of insufficiently funded checks, thereby increasing our costs.

Managers from National Westminster Bank, Steinbachs, and the NJHEAA expressed similar concerns.

The ACPE responds that under existing case law it was required to conclude that lawyers and law firms may not, upon receiving checks on behalf of their institutional clients, endorse the checks in the clients' names. In advising against the attempt to receive blanket authorization to endorse checks, the ACPE relied on *IMO Opinion 635, supra,* and *In re Conroy,* 56 *N.J.* 279, 266 *A.*2d 279 (1970).

In *Conroy,* this Court made clear its disapproval of any retainer agreement that grants an attorney the power to endorse a client's name on a check. Conroy was a personal injury lawyer who endorsed his clients' names to a settlement check received from an insurance company in a personal injury case. *Conroy, supra,* 56 *N.J.* at 280, 266 *A.*2d 279. Although the check had been drawn to the two clients and Conroy, Conroy endorsed all the names and deposited the check into his wife's account. *Id.* at 280, 282, 266

A.2d 279. When the clients learned of this after contacting the insurance company, they filed an ethics complaint. *Id.* at 280, 266 A.2d 279.

At the Ethics Committee hearing, Conroy stated that it was his practice in negligence cases to use a retainer form that contained the power of attorney to endorse a client's name on a settlement check, deposit it and make the appropriate disbursements after it had cleared. *Id.* at 281, 266 A.2d 279. The form stated in part:

He is to have full power ... to execute any draft or check in _____ behalf and to make disbursements of the proceeds covering all medical and hospital bills and to retain ___% of the total recovered if settled and ___% if trial is had.

[*Ibid.*]

In disapproving the form of retainer used, the Court stated:

We pause at this point to make clear that we consider employment by members of the bar of the type of retainer and power of attorney described above to be highly improper. The practice of insurance carriers or other settlors in drawing settlement checks in the joint names of the attorney and the claimants is to protect and preserve the interests of all three parties to the transaction. The form of retainer in question facilitates the subversion of that purpose and *is unqualifiedly disapproved.*

[*Id.* at 282, 266 A.2d 279 (emphasis added).]

This Court considered and disapproved of a similar form in *IMO Opinion 635, supra.* In that opinion, the Court reviewed an ACPE determination concerning a lawyer's use of an "Authorization to Endorse" form. *IMO Opinion 635, supra,* 125 *N.J.* at 182, 592 A.2d 1210. A law firm had sought from the ACPE an advisory opinion that the firm's use of that form in personal injury cases conformed to ethical requirements. *Ibid.* When executed by the client, the form would have authorized the lawyer to endorse a client's name on a draft representing the amount of settlement in a tort action. *Ibid.* The lawyer would then deposit the endorsed draft in his or her trust account before final distribution of the proceeds. *Ibid.*

The ACPE distinguished *Conroy* and found nothing improper in the law firm's suggested procedure. *Id.* at 183, 592 A.2d 1210. It observed that the authorization form in question would be execut-

ed only *after* the settlement had been consummated, releases had been executed, and the client had signed the closing statement for contingency matters as required by *Rule* 1:21–7. *Ibid.* In contrast, the power of attorney in *Conroy* was in the retainer agreement.

The Court granted petitions for review filed by the Clients' Security Fund of the Bar of New Jersey and the Office of Attorney Ethics (OAE). *Id.* at 184, 592 *A.*2d 1210. The OAE emphasized in its petition the risks that are created when an attorney is allowed to endorse settlement drafts. *Ibid.* According to the OAE, the ACPE's holding would increase the opportunity for misappropriation of client funds by depriving clients of actual notice of the amount of the settlement and the date on which the funds were received. *Ibid.* Finally, the OAE warned that many attorneys would fail to give clients adequate warning of the possible dangers of authorizing their attorney to endorse checks on their behalf. *Ibid.*

The Court substantially modified the ACPE's opinion by limiting the circumstances under which the power of attorney form could be used. *Id.* at 187, 592 *A.*2d 1210. Although the Court reaffirmed its confidence in the integrity in the bar in general, it feared that a small number of lawyers would be tempted to take advantage of the opportunity for fraud that use of the form would have created. *Ibid.* The Court concluded as a matter of policy that the advantage gained in client convenience did not outweigh the increased risk for the unscrupulous lawyer to victimize his or her clients. *Ibid.* The Court stated:

> We should make clear exactly what it is that we are disapproving: the routine use of a form that extends power of attorney to the lawyer in endorsing the client's name to a settlement draft. We will not permit the form to become a part of the package of a lawyer's ordinary closing papers.
>
> [*Ibid.*]

The Court acknowledged, however, that there might be "extraordinary circumstances" that would justify use of such a power of attorney. *Ibid.* The circumstances used as examples are truly extraordinary—a client on the eve of departure for an extended

stay in a foreign land, or a client about to undergo surgery with a doubtful prognosis and an extended hospital stay. *Ibid.*

Based on the strong language used in *Conroy* and *IMO Opinion 635*, the ACPE in the present case felt constrained to disapprove of collections attorneys' routine use of a form that contains a power of attorney to endorse a client's name on checks made payable to the client. The ACPE found that the kind of extraordinary circumstances required by *IMO Opinion 635* were not presented by the present petitioners. In view of this Court's prior decisions, the ACPE's decision was not only understandable but justifiable as well.

-B-

■ The essence of the present application is a request by institutional client-creditors to permit the present system to continue because of its convenience and cost effectiveness. The institutional client-creditors believe enough is gained by them to justify the procedure that has been followed for forty years without any known attorney misconduct. They believe this satisfies one of the "extraordinary circumstances" contemplated by *IMO Opinion 635* that justifies the use of the power of attorney to endorse a client-creditor's name to the draft.

We agree with petitioners that the sheer volume of the claims they manage for their institutional client-creditors creates an extraordinary circumstance that requires special treatment. Each year, the major collections firms handle tens of thousands of payments on behalf of their clients. Requiring clients to endorse each monthly payment would require an extraordinary amount of effort, reduce the efficiency at both the client's and firm's office, and as a result, significantly increase the client's costs. In addition, such a practice would likely delay the deposit of payments and thereby increase the number of insufficiently-funded checks. Although those circumstances are decidedly different from the examples set forth in *IMO Opinion 635*, there is no language in that opinion indicating that the extraordinary circumstances enu-

merated therein were intended to be exhaustive. *See State v. Stevens,* 115 *N.J.* 289, 300, 558 *A.*2d 833 (1989) (holding the examples listed in *Evidence Rule 55,* now *N.J.R.E.* 404(b), were not exclusive).

A cost effective collection system reduces the cost of credit. If reducing the cost of credit can be achieved without materially enhancing the risk of attorney misconduct, then the advantages to the client and the consumer outweigh any minimal risk of an unscrupulous lawyer victimizing his or her institutional client. This is a case in which the public interest cries out for practical considerations and common sense to prevail over technical restrictions that will increase the cost of borrowing without reasonable justification. *See In re Opinion No. 26 of Committee on Unauth. Practice of Law,* 139 *N.J.* 323, 343–44, 654 *A.*2d 1344 (1995). The wishes of clients in a position to dictate the business terms of a retainer agreement are entitled to considerable weight. *See id.* at 354, 654 *A.*2d 1344. The institutional clients participating in the collections practice involved here are highly sophisticated business people who have concluded that the existing practice is well worth the minimal risk that an unscrupulous lawyer might have been selected.

We hold that under the extraordinary circumstances presented, a lawyer or law firm concentrating in debt collections may, at the request of an institutional client-creditor, use the power of attorney in endorsing the client-creditor's name to drafts from debtors without violating *IMO Opinion 635* or *Conroy,* both of which involved personal injury cases. While reaffirming our holdings in those two cases, we note that a new regulation, *N.J.A.C.* 11:2–17.11, promulgated by the New Jersey Department of Insurance requiring insurance carriers to provide written notice to claimants when third-party claims are paid, may ameliorate some of the Court's concerns expressed in *IMO Opinion 635.*

### III

Next we address whether lawyers and law firms that concentrate in the field of collections law may deduct their contin-

gent fees without prior approval of the client-creditor. The client-creditors prefer advance deductions to avoid the necessity of additional bookkeeping. Petitioners argue that any danger of misappropriation is minimal because client-creditors routinely audit their accounts at the law firm or lawyer's office.

The fee deduction procedure described by petitioners is one in which client-creditors do not learn of their attorneys' receipt of installment payments from debtors, the amount of the payments, or the actual amount of the contingent fee deduction until after the law firm has deducted its fee. Although petitioners contend that this procedure is practical, necessary, and convenient, the ACPE determined that the procedure is inconsistent with *Rule of Professional Conduct* 1.15(c), and *In re Stein,* 97 *N.J.* 550, 483 *A.*2d 109 (1984). The rule provides:

> When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.
>
> [*RPC* 1.15(c).]

In *In re Stein,* the Court disapproved of an attorney unilaterally withdrawing funds belonging to the client from the attorney's trust account. The Court prohibited the practice of an attorney deducting contingent fees from a client's account prior to receiving the client's express consent after full disclosure. *In re Stein, supra,* 97 *N.J.* at 564, 483 *A.*2d 109. There, the funds were given to the attorney by the client to hold for the payment of child support and attorney fees. *Id.* at 555, 483 *A.*2d 109.

By withdrawing funds from the client's account and not giving the client prior notice, an attorney would be violating *Rule of Professional Conduct* 1.15(c). In a typical case, an attorney cannot know whether there is or will be a dispute with a client until the client has been provided with the following information: (1) the matter has been settled or proceeded to judgment; (2) the amount of the settlement or judgment; and (3) the amount of the fee to be deducted and withdrawn by the attorney. *Joint Opinion*

*666/14, supra,* 132 *N.J.L.J.* at 267. Thus, in a typical case it would be unethical for an attorney to deduct a fee before the client has been given notice and an opportunity to dispute the division of the property.

Petitioners argue that debt collections services for their institutional clients are atypical because their clients know from the outset the total amount that the collections firms are supposed to collect and the formula to be employed in dividing the proceeds. Indeed, those terms are fixed by the client. Therefore, petitioners argue, it is not inappropriate for an accounting and remittance to occur simultaneously. Each month collections law firms process thousands of payments on behalf of their client-creditors and it would be extremely burdensome and time consuming if client-creditors had to give separate advance authorization before the contingent fees could be deducted from each payment.

We are persuaded that in this high volume practice of debt collections for institutional clients, an exception to *Rule of Professional Conduct* 1.15(c) should be created without requiring a fidelity bond. Here, too, the institutional clients want the existing practice to continue because of its benefits and minimal risks. Furthermore, in today's business world of telecommunications and electronic transfer of funds, remittance and approval of fee deductions can occur nearly simultaneously. We emphasize that our decision does not excuse an attorney from otherwise complying with all the Rules of Professional Conduct.

The ACPE determination is hereby modified in accordance with this opinion.

*For Modification*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.