687 A.2d 1000

IN RE OPINION 682 OF THE ADVISORY COMMITTEE
ON PROFESSIONAL ETHICS.

Argued October 7, 1996—Decided January 27, 1997.

*Lee B. Roth,* argued the cause for appellant, *pro se.*

*Paul I. Tannenbaum,* Deputy Attorney General, argued the cause for respondent, Advisory Committee on Professional Ethics (*Peter G. Verniero,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*Joseph M. Clayton, Jr.* submitted a brief on behalf of the amicus curiae New Jersey Land Title Association.

*George W. Canellis* submitted a brief on behalf of amicus curiae New Jersey State Bar Association.

The opinion of the Court was delivered by

GARIBALDI, J.

Petitioner initially asked the Advisory Committee on Professional Ethics (ACPE) to review and modify Opinion 495, 109 *N.J.L.J.* 329 (Apr. 22, 1982), Opinion 513, 111 *N.J.L.J.* 392 (Apr. 14, 1983), Opinion 612, 121 *N.J.L.J* 1010 (May 18, 1988), and Opinion 639, 125 *N.J.L.J.* 894 (Apr. 5, 1990), so that attorneys could become full participants in a bar-related title-insurance company owned and managed by lawyers. On February 5, 1996, the ACPE issued Opinion 682, 143 *N.J.L.J.* 454. In that opinion, the ACPE refused to alter its prior opinions, holding that attorney participation in a bar-related title-insurance company would create inherent conflicts of interest. Additionally, the ACPE found that allowing an attorney to receive part of the title-insurance premium as part of his fee for representing the client would violate *Rule of Professional Conduct (RPC)* 1.8(f)(2) because it results in "a circumstance which can adversely impair the lawyer's professional judgment." Opinion 682, *supra,* 143 *N.J.L.J.* at 535. We granted petitioner's Petition for Review. 144 *N.J.* 374, 676 *A.*2d 1090 (1996).

I

A group of New Jersey lawyers seeks to form the New Jersey Attorneys Title Corporation (NJATC), intending to operate it as a

bar-related title-insurance company.[1] The would-be founding members of the NJATC were previously chairs or members of the Board of Consultors of the Real Property, Probate, and Trust Law Section of the New Jersey State Bar Association.[2] Lawyers who participate in NJATC would become stockholders of the corporation. The corporation would not, however, distribute a dividend. Moreover, the stock could never be traded and would always have a nominal value. Stockholders would elect a board of directors that would hire a professional staff to manage the company. Neither founding members nor directors would receive compensation, beyond reimbursement for expenses, for their services.

Initially, NJATC would function as a title agency for Connecticut Attorneys Title Insurance Company, an associated, but independent, title company licensed to do business in New Jersey. When sufficient capital accrued to meet regulatory requirements, NJATC could qualify with the New Jersey Department of Insurance and become an independent title-insurance company.

The proposal for NJATC contemplates that attorney-stockholders would refer clients to the company for title examination and insurance. Before referring clients to NJATC, attorneys would be required to disclose their interest in the company. In addition, attorneys would have to inform their clients that they have the option of purchasing title insurance elsewhere. Finally, attorneys would have to explain any potential conflicts of interest to their clients.

Premiums charged by NJATC would be in accordance with the regulations of the Department of Insurance. Attorney stockholders would retain a portion of the title-insurance premium paid by the client as a part of their fee for representing that client. Petitioner claims that the amount of the premium retained would

---

[1] Although the term bar-related is used, the corporation has no relationship with the New Jersey State Bar Association.

[2] The New Jersey State Bar Association has filed a brief as *amicus curiae*.

be based on the work the lawyer did in relation to the title. Members would not be required to participate in underwriting decisions of NJATC—they could elect not to do so, or the company could deem that they are unqualified to do so. Title questions concerning whether a title-insurance contract should contain exceptions would be directed to NJATC's independent attorney.

Some states have established bar-related title companies. Petitioner claims that NJATC, like those companies, would provide the public with more thorough title examinations, price competition between NJATC and title companies unaffiliated with attorneys, a possible attorney guaranty fund in the future, and the introduction of "a qualified independent attorney back into the residential real estate closing process."

## II

In Opinion 682, *supra,* 143 *N.J.L.J.* at 535, the ACPE found that "attorneys who are holders of substantive beneficial interests in a title insurance company, such as commissions, rebates or profit sharing, may not purchase title insurance from that company on behalf of their real estate purchasing clients." According to the ACPE, attorneys in NJATC would serve two roles in real-estate transactions. They would act as title agents, participating in the underwriting decisions of the insurance carrier, and as the attorneys for the purchasers in the underlying real-estate transactions. The ACPE determined that such a dual role constitutes a conflict of interest. The ACPE also found that nothing in *In re Opinion No. 26 of the Committee on the Unauthorized Practice of Law,* 139 *N.J.* 323, 654 *A.2d* 1344 (1995) requires or encourages the conclusion that an attorney should be able to refer a client to a bar-related title-insurance company in which the attorney owns a beneficial interest.

In addition, the ACPE ruled that *RPC* 1.8(f) governed the dispute. According to *RPC* 1.8(f), lawyers can only accept compensation for representing a client from the client. By allowing the attorney to retain a portion of the premium, the title company

would be compensating the attorney for representing the client. Although a client can waive *RPC* 1.8(f) after full disclosure, the ACPE ruled that consent would be inappropriate because the situation would adversely affect the lawyer's independent professional judgment. *Ibid.* (citing *RPC* 1.8(f)(2)). The ACPE stated, "[T]he availability of a rebate from the title insurance company, or retention of a portion of the title premium, puts the lawyer in a conflict of interest situation in determining in behalf of the client (1) whether title insurance is necessary at all in the particular circumstances, and, if so, (2) which title company to use." *Ibid.* (citation omitted).

The ACPE concluded: "In any of these situations, possible savings to the client are, at best, of secondary importance. The undivided fidelity of the lawyer to the client is of prime importance. We deem the inquiry to involve a contradiction of that obligation." *Ibid.* Accordingly, the ACPE upheld its prior opinions and refused to allow attorneys to become full participants in a bar-related title-insurance company owned and managed by lawyers.

## III

"In almost all real-estate closings throughout the State the title-insurance carrier conducts the search of the title and determines the extent of title-insurance coverage." *Sears Mortgage Corp. v. Rose,* 134 *N.J.* 326, 339, 634 *A.*2d 74 (1993). Title-insurance policies usually cover risks arising from errors in the title examination, some known defects, defects that would be disclosed by an examination, and some undisclosed defects that would remain hidden even after a competent examination of public records. Paul Bintinger, *Conflict of Interest: Attorney as Title Insurance Agent,* 4 *Geo. J. Legal Ethics* 687, 690–91 (1991). However, they do not usually cover defects disclosed by the title examination, defects that would be apparent if the premises were physically inspected, defects that arise after the policy is issued, defects the insured knows about, and hidden defects not disclosed

by a competent examination of the public records. *Id.* at 691. Defects not covered by title insurance are called exceptions.

Although sellers and buyers can represent themselves in real-estate transactions, this Court has strongly suggested that both parties should be represented by counsel. *In re Opinion No. 26, supra,* 139 *N.J.* 323, 325, 654 *A.*2d 1344. Purchasers' attorneys often play a significant role in real-estate transactions. In addition to representing purchasers, attorneys frequently act as the representatives of the title insurers and perform the functions of title agents. *See Sears Mortgage, supra,* 134 *N.J.* at 340, 634 *A.*2d 74. Those functions include, but are not limited to, accepting the deed, title, and closing documents from the seller, removing the exceptions from the title according to the title commitment, disbursing all moneys, and authorizing the issuance of insurance. *Ibid.*

We agree with the ACPE that its prior opinions, and not *In re Opinion No. 26, supra,* 139 *N.J.* 323, 654 *A.*2d 1344, govern. In *In re Opinion No. 26,* the Court ruled that buyers and sellers of real property would be permitted to proceed without being represented by counsel so long as they were informed of the risks and interests of others. However, we did not imply or suggest that attorneys would be allowed to own and manage a bar-related insurance company. Nor did the Court overrule any of the ACPE's prior opinions.

Opinions 495 and 612 are the most relevant to this matter. In Opinion 495, *supra,* 109 *N.J.L.J.* 329, the ACPE held that a conflict of interest arises when attorneys for real-estate purchasers obtain title insurance from companies in which they own a beneficial interest. *Id.* at 351. Although the ACPE recognized that both the buyer and title insurer desire good, marketable title, it found that argument to be too simplistic and articulated the conflict of interest as follows:

> [E]ach title binder which contains standard exceptions and specifically related exceptions presents an absolute conflict requiring independent evaluation in every case and, conceivably, hard negotiation; on the one hand, ... to expand liability and, on the other, to limit or restrict liability. The situation presented is basically

contrary to the professional standards required and inherently creative of an appearance of impropriety such that it cannot be permitted even if disclosure is made to all parties.

[*Ibid.*]

In Opinion 612, *supra,* 121 *N.J.L.J.* 1010, the ACPE reached a similar conclusion when a group of attorneys wanted to buy a majority stock interest in a local title-abstract company, which was an agent for a nationally known underwriter. The attorneys, as stockholders, were to receive dividends from the company. *Ibid.* The ACPE stated, *inter alia,* that the conflict of interest addressed in Opinion 495 precluded the attorneys from using the title-abstract companies for the benefit of their clients even with full disclosure. *Id.* at 1037. Finally, the ACPE stated that its conclusion would be no different if the attorneys purchased their own title-abstract company. *Ibid.; see also* Opinion 639, *supra,* 125 *N.J.L.J.* 894 (prohibiting law firm from using services of title company owned by associate of firm because of "the inherent potential for conflict which tends to create uneasiness and suspicion in the minds of all parties to these transactions.").

However, in Opinion 513, *supra,* 111 *N.J.L.J.* 392, the ACPE did permit an attorney who owned a minority stock interest in a local title-abstract company to obtain title insurance for a client from a nationally known underwriter, which owned a majority interest in the abstract company. The ACPE ruled that the possible conflict of interest could be cured by full disclosure because the attorney had no direct relationship with the national underwriter and because of the degree of independence between the attorney and the local company. *Id.* Here, the relationship is not so attenuated and the splitting of fees diminishes the independence between the NJATC and its attorney-stockholders. Thus, Opinion 513 does not support petitioner's analysis.

## IV

In conflict of interest situations, *RPC* 1.7(b) prohibits dual representation unless (1) the lawyer believes that representing one client will not adversely affect the representation of the other

client, and (2) the clients consent after full disclosure. That rule is limited by *RPC* 1.7(c):

> This rule [RPC 1.7(b)] shall not alter the effect of case law or ethics opinions to the effect that:
>
> (1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and
>
> (2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

■ A lawyer's duty in representing a client in the purchase of title insurance includes, *inter alia*, advocating on behalf of the client to obtain the most comprehensive coverage possible, compliance with all applicable principles of law, more favorable drafting of exceptions, minimal requirements for curing defects, and curing defects that have been implicitly insured. On the other hand, an attorney who acts as the agent for a title-insurance company owes the company a duty to minimize its losses; i.e., the attorney should write an insurance policy to minimize the title-insurance company's risk. One of the agent's duties to that company is to protect it from losses. The attorney should retain exceptions for any questionable items and should be cautious in authorizing insurance to deal with specific title related problems. Thus, attorneys who represent both purchasers and title-insurance companies in the same transactions place themselves in the position of serving two masters with incompatible interests.

■ Attorneys who undertake to represent both clients and title companies place themselves in a position of negotiating for both sides in the same transaction. In the most basic terms, the purchaser seeks the maximum possible protection, as the success of any future claim depends on limiting exceptions and obtaining the most comprehensive coverage to protect against loss. The title company's interest is opposed to that of the purchaser; it strives to limit liability as much as possible in the event of a claim under the policy. In those instances in which exceptions are negotiable, consent, no matter how well informed, will not remedy

the conflict of interest.  *See* Opinion 576, 1986 WL 68785 (N.Y. St. Bar Assn. Comm. Prof. Eth. June 5, 1986) at *6 n. 5 (noting that where exceptions to title are negotiable, dual representation is improper regardless of disclosure and client consent).

■  Even if no clear conflict arises in negotiating title insurance, the pursuit of the client's best interests requires that a lawyer exercise independent professional judgment.  When an attorney is both advocate for a buyer and agent for a title-insurance company, the independence of that lawyer's judgment inevitably is called into question.  For example, the initial determination of whether title insurance is necessary is likely to be affected by the lawyer's financial interest.  Given the decision to insure, financial incentives also will likely influence which title-insurance company is chosen.  An attorney with a financial interest in a title company has an incentive to refer a client to that company even if broader and less expensive coverage is available elsewhere.  Bintinger, *supra*, 4 *Geo. J. Legal Ethics* at 697.  As one commentator noted:

> The plot thickens even further in the event of a claim.  Learning that the negligence of the attorney's staff contributed to the loss, but also knowing that the negligence might not be found by the insured's efforts leaves the attorney in a conundrum.  Even with the assumption that the attorney cannot represent the insured in this matter, how much of what the attorney knows will be discoverable in the battle between the title insurer and the insured?  Is the premium income worth the risk of confronting this situation?
>
> [T.  Mary McDonald, *RESPA's New Requirements for Attorneys Writing Title Insurance and Ongoing Ethical Concerns, in Title Insurance 1993*, at 6 (PLI Real Estate Law and Practice Course Handbook Series No. 397, 1993) [hereinafter *RESPA's New Requirements* ].]

Because the attorney's representation of the client is limited by responsibilities to a third party (the title company) and to the attorney's own interests (to collect a share of the premium as a fee for securing the title policy), the NJATC proposal violates *RPC* 1.7.  Although dual representation in some conflict-of-interest cases may be possible with full disclosure and consent, that consent is no remedy here because buyers and sellers are typically the least sophisticated players in real-estate transactions.  In *In*

*re Opinion No. 26, supra,* we repeatedly stressed the need for buyers and sellers to be represented by counsel. They depend on their attorneys to represent them diligently. The conflict of interest in such situations is unavoidable, and informed consent cannot rectify the problem.

In reaching that conclusion, we acknowledge petitioner's assertion that all parties to the transaction normally seek a common goal—good and marketable title. *See* Opinion 495, *supra,* 109 *N.J.L.J.* at 351. Petitioner states that labeling the parties as adversaries is misleading and emphasizes or distorts any potential conflicts. Although that statement is true as a simple observation, the notion that two parties are working toward the same goal does not necessarily make them non-adversarial parties. In fact, the parties may undergo intense bargaining to reach the desired result, especially when there are obstacles such as exceptions for defects.

Advocates of bar-related title-insurance companies seek to counter those criticisms by claiming that the attorney represents only the client and that any title problems may be referred to the title insurer for an impartial underwriting decision in which the attorney would function as a zealous advocate for the client. Bintinger, *supra,* 4 *Geo. J. Legal Ethics* at 700–01. They reason that the title company's underwriting guidelines and the ability to consult with independent counsel will resolve all potential conflicts. Judgment calls, however, often are made before deciding whether to seek counsel, and the decisionmaking process related to analyzing issues and presenting them to the company's counsel involves determinations in which the attorney faces conflicting interests. Thus, the fact that the attorney recognizes and calls attention to a potential defect or title problem affirms that there is an inherent conflict of interest. Any duty to discover or disclose potential defects or problems in title flows from the agency agreement between the attorney and the title company or agency and may directly conflict with the client's best interests. *Id.* at 701.

We also disagree with petitioner's reliance on *Sears Mortgage,* *supra,* 134 *N.J.* 326, 634 *A.*2d 74. *Sears Mortgage* was a unique case that involved defalcation of funds by a closing attorney. To protect a purchaser-client's interests, we held that title insurers are liable to purchasers when closing attorneys steal money earmarked for the payment and satisfaction of an existing first mortgage on the property. In so holding, we found that the title company "was in the best position to prevent the loss created by [the attorney's] theft," *id.* at 345, 634 *A.*2d 74, noting that insurance contracts are "contracts of adhesion between parties who are not on an equal footing." *Id.* at 347, 634 *A.*2d 74. We also concluded that for certain limited ministerial activities that do not inure to the purchaser's detriment—such as applying purchase moneys to satisfy and cancel an existing mortgage, securing clear title for the purchaser, and obtaining from the carrier a title-insurance policy covering that title—the purchaser's attorney "may properly be found to be the agent of the title-insurance company." *Id.* at 337, 342, 634 *A.*2d 74. However, we did not address the issue currently before the Court.

## V

We are not persuaded to recognize bar-related title companies because the American Bar Association (ABA) and other states have done so. The ABA currently permits an attorney to perform legal services for both a title-insurance company and a purchaser in a real-estate transaction if two conditions are met: (1) it must be obvious that the lawyer can adequately represent the interest of each party; and (2) both the title company and the purchaser must consent to the dual representation after full disclosure of the possible effects of such representation on the lawyer's independent professional judgment. ABA Comm. on Ethics and Professional Responsibility, Formal Op. 331 (1972); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 304 (1961). The ABA's position on attorneys owning a portion of a title insurance company is "if the lawyer is financially interested in a title company

which will supply title insurance to his client, he must obtain consent of his client after making full disclosure to the client of the circumstances." ABA Comm., *supra,* Formal Op. 331.

First, *RPC* 1.7 is more restrictive than *Rule* 1.7 of the ABA Model Rules of Professional Conduct. We have added paragraph (c) to *Rule* 1.7. See *supra* at 367–68, 687 *A.2d* at 1003. Both *RPC* 1.7(c)(1) and (2) are applicable to this matter. Second, ABA Opinions 304 and 331 have been criticized. *See, e.g.,* Bintinger, *supra,* 4 *Geo. J. Legal Ethics* at 705 (recommending that ABA reexamine Opinions 304 and 331 and their progeny and declare practice of attorney functioning as title-insurance agent for client unethical). Moreover, the ABA's position on whether attorneys can provide ancillary services to clients and other non-client customers has wavered in recent years. In 1991, by an eleven vote margin out of almost 400 votes, the House of Delegates adopted *Model Rule* 5.7, which would have limited an attorney's ability to engage in ancillary businesses, only to reverse itself the following year by a seven vote majority. *McDonald, supra, RESPA's New Requirements* at 8. Although the ownership of title companies was not the genesis behind *Rule* 5.7, such ownership would seem to fit within the definition of ancillary services. *Id.* at 11.

Third, no consensus or trend has formed on the issue of dual representation in bar-related title companies in other jurisdictions. Florida permits attorneys who own a substantial interest in a title-insurance company to represent both the company and the purchaser so long as the attorneys disclose their financial interest in the title company. Opinion 73–1, 1973 WL 20140 (Fla. St. Bar Assn. Apr. 20, 1993). Florida also allows its attorneys to retain a share of the premiums their clients pay for title insurance as part of their fees if there is full disclosure. Opinion 75–6, 1975 WL 21297 (Fla. St. Bar Assn. June 25, 1976). Other states follow the two-pronged approach of the Model Rules. *See, e.g.,* Opinion 80–F–2, 1980 WL 128697 (Tenn.Bd.Prof.Resp. Oct. 28, 1980); Opinion 408, 1984 WL 50126 (Tex.Prof.Eth.Comm. Jan. 1984). However,

some states forbid the practice because they recognize the inherent conflicts in representing both parties. Bintinger, *supra,* 4 *Geo. J. Legal Ethics* at 703 n. 133.

Other states take a middle-of-the-road approach by allowing dual representation with certain safeguards. *See, e.g.,* Opinion 621, 1991 WL 164535 (N.Y. St. Bar Assn. Comm. Prof. Eth. Apr. 18, 1991); Opinion 595, 1988 WL 236153 (N.Y. St. Bar Assn. Comm. Prof. Eth. Nov. 2, 1988). For example, attorneys in New York are heavily restricted in referring title-insurance business to title agencies that they own, but they have more flexibility in performing legal services for both a title company and the purchaser when they do not own an interest in the title-insurance company and act only as an agent. Opinion 621, *supra;* Opinion 576, 1986 WL 68785 (N.Y. St. Bar Assn. Comm. Prof. Eth. June 5, 1986).

## VI

Petitioner did not provide sufficient evidence to overturn Opinion 682. Based on this record, we find that NJATC would create a conflict of interest for participating attorneys and that that conflict would be exacerbated by the premium-rate proposal. In *In re Advisory Committee on Professional Ethics No. 22–95,* 144 *N.J.* 590, 677 *A.*2d 1100 (1996), the Court modified an ACPE ruling because clients presented well-established evidence to show that a cost-effective collection system reduced the cost of credit and was a substantial benefit to clients. No evidence in this record establishes that clients will receive a benefit from the formation of NJATC.

We do not bar further consideration of the establishment of a bar-related title company. For example, if the New Jersey State Bar Association proposed a bar-related title company that eliminated substantially all of the concerns expressed here and in Opinion 682, the ACPE would review that proposal.

We affirm Opinion 682.

*For affirmance*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.